RUSING LOPEZ & LIZARDI, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262

Michael J. Rusing
State Bar No. 006617; PCC No. 50020
mrusing@rllaz.com

Sivan R. Korn
State Bar No. 024231; PCC No. 65913
skorn@rllaz.com

Sarah L. Letzkus
State Bar No. 027314; PCC No. 66655
sletzkus@rllaz.com

*Attorneys for Plaintiff*



**CV16-0191 TUCFRZ**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

Research Corporation Technologies, Inc., a Delaware nonstock corporation,

  Plaintiff,

vs.

Eli Lilly and Company, an Indiana corporation,

  Defendant.

Case No.

**VERIFIED COMPLAINT**
**(Submitted Under Seal)**

Assigned to:

For its Complaint against Eli Lilly and Company ("Lilly"), Research Corporation Technologies, Inc. ("RCT") states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. RCT is a nonstock corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Tucson, Arizona.

2. Lilly is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana.

3. Lilly is a global pharmaceutical company.

4. Lilly has qualified to transact business in Arizona, maintains a statutory agent for service of process in Arizona, and has employees and agents in Arizona.

5. Upon information and belief, Lilly maintains an office in Arizona, engages in lobbying efforts in Arizona, pays royalties in Arizona, and markets and has millions of dollars in annual revenues from sales of its products in Arizona.

6. At all times relevant to RCT's claims, Lilly acted through its duly appointed agents, who were acting on Lilly's behalf and within the scope of their actual, express, implied, or apparent authority.

7. This Court has personal jurisdiction over Lilly due to its continuous and systematic contacts with the State of Arizona.

8. This Court also has personal jurisdiction over Lilly because Lilly engaged in intentional and wrongful conduct aimed at RCT, causing damage to RCT in Arizona.

9. This Court has subject matter jurisdiction over RCT's claims under 28 U.S.C. § 1332, as RCT and Lilly are citizens of different states, and the amount in controversy exceeds the jurisdictional amount of $75,000.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) and (c)(3).

## FACTS COMMON TO ALL COUNTS

### *The Technology at Issue*

11. *Pichia pastoris* ("Pichia") is a species of methylotrophic yeast.

12. In 1980s and early 1990s, researchers at the Phillips Petroleum Company ("Phillips") engineered strains of Pichia and associated genetic vectors, tools, and components for use with those strains, and developed methods of using the strains and components to produce proteins and other chemicals using recombinant DNA techniques in which Pichia acts as a host cell (collectively, the "Pichia Technology").

13. The Pichia Technology can be used in the production of protein-based pharmaceutical products, such as insulin.

14. The Pichia Technology can also be used to express enzymes (a type of protein) and other molecules that, in turn, are used in the production of protein-based pharmaceutical products, which are themselves produced by either a Pichia expression

system or another expression system.

15. Certain aspects of the Pichia Technology are the subject of patents issued by the United States Patent and Trademark Office and patents issued by foreign patent authorities (the "Patent Rights").

16. Other aspects of the Pichia Technology are, and have been, designated and treated as confidential information and trade secrets (the "Proprietary Information").

17. The Proprietary Information has been and remains not generally known and not readily ascertainable by proper means.

18. The Pichia Technology, as deployed using the Proprietary Information, offers technical, economic, and other advantages over other expression systems, including other yeast and bacteria-based expression systems, such as increased efficiency, quantity, and quality.

19. For example, proteins produced using the Pichia Technology have characteristics that render them more suitable for use as pharmaceuticals, or require fewer processing steps to extract them from the supernatant containing the cells of the Pichia strains producing the proteins.

20. On or about September 23, 1993, Phillips sold, assigned, and transferred to RCT the Pichia Technology, the Patent Rights, the Proprietary Information, and all related intellectual property rights owned or controlled by Phillips, as well as all related licenses granted to or by Phillips (collectively, the "Pichia Estate").

21. Although Phillips and RCT have disclosed aspects of the Proprietary Information to third parties under license agreements related to the Pichia Technology, each such disclosure was made under contracts imposing use restrictions and obligations of confidentiality on the receiving party.

### *The Lilly License Agreement*

22. On or about April 4, 1990, Phillips and Lilly entered into a non-exclusive License Agreement (the "License Agreement"), in which Phillips granted Lilly certain

1  specified rights to the Pichia Estate.

2  23.   Phillips and Lilly amended the License Agreement on or about March 7, 1991.

4  24.   A complete and accurate copy of the License Agreement, as amended, is attached as Exhibit A.

6  25.   On or about September 23, 1993, RCT succeeded to Phillips' rights under the License Agreement.

8  26.   The License Agreement has not been terminated.

9  27.   The License Agreement is in effect.

10 28.   Under Section 10.1 of the License Agreement, the License Agreement will remain in effect until the last Patent Right expires.

### *The Scope of the License*

29.   Under Section 3.1.1 of the License Agreement, Lilly was granted:
[a] license under the Patent Rights to produce Product or Reagent throughout the Territory, use Product or Reagent for research purposes, or sell the thus produced Product or Reagent for use in humans or for diagnostic purposes related to human medicine or for animal therapeutics or diagnostics throughout the Territory.

30.   Under Section 3.1.2 of the License Agreement, Lilly also was granted:
[a] license to use Expression Technology to produce Product or Reagent throughout the Territory, use Product or Reagent for research purposes, or sell the thus produced Product or Reagent for use in humans or for diagnostic purposes related to human medicine or for animal therapeutics or diagnostics throughout the Territory.

31.   "Expression Technology" is defined in Section 1.9 of the License Agreement to mean "Phillips technology and materials useful in the production of Product or Reagent."

32.   "Reagent" is defined in Section 1.8 of the License Agreement to mean "a material produced using the Expression Technology and which is used in the manufacture or development of Product or which is used for research purposes."

33.   "Product" is defined in Sections 1.5, 1.6, and 1.7 of the License Agreement to mean a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate

1 consumer and "which is produced by an Expression System."

2  34. "Expression System" is defined in Section 1.3 of the License Agreement as "the Host Strain containing an Expression Vector which directs the production of Product or Reagent."

35. "Host Strain" is defined in Section 1.1 of the License Agreement to mean a specific strain of Pichia, identified as GTS115, or other Pichia strains derived from the particular strain provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

36. "Expression Vector" is defined in Section 1.2 of the License Agreement to mean certain vectors described in Attachment A to the License Agreement, or vectors derived from the vector provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

37. The License Agreement granted Lilly the right under the Patent Rights solely to: (a) produce "Product" or "Reagent;" (b) sell any "Product" or "Reagent" produced; or (c) use "Product" or "Reagent" for research.

38. The License Agreement granted Lilly the right to use the Expression Technology solely to: (a) produce "Product" or "Reagent;" (b) sell any "Product" or "Reagent" produced; or (c) use "Product" or "Reagent" for research.

39. The License Agreement did not grant Lilly the right under the Patent Rights to produce any products other than "Product" or "Reagent," as those terms are defined in the License Agreement, except for research.

40. The License Agreement did not grant Lilly the right to use the Expression Technology to produce any products other than "Product" or "Reagent," as those terms are defined in the License Agreement, except for research.

41. A "Product" must be produced by an Expression System and a "Reagent"

must be produced using the Expression Technology.

42. A product that is not produced by an Expression System is not a "Product," as this term is defined by the License Agreement.

43. A material that is produced without use of the Expression Technology or, if produced with the Expression Technology, but which is not used either in the manufacture or development of Product or for research purposes, is not a "Reagent," as this term is defined by the License Agreement.

44. Section 3 of the License Agreement enumerates certain conditions under which Lilly may extend sublicenses under the licenses granted by the License Agreement to an "Affiliate" (as defined in Section 1.14 of the License Agreement) or to a third party.

45. Section 3 of the License Agreement conditions Lilly's right to extend sublicenses on Lilly's not then being in default under the License Agreement.

46. The rights under the License Agreement that Lilly may grant in a sublicense to a third party that is not an Affiliate are limited to the right "to make Product or Reagent solely for [Lilly] or its Affiliate."

47. Under the License Agreement, Lilly may not grant sublicenses to a third party under any circumstances other than those specified in Section 3 of the License Agreement.

### *Confidentiality Obligations*

48. Section 6 of the License Agreement, entitled "Secrecy," requires Lilly to treat as secret all information and material that the licensor (initially Phillips and subsequently RCT) considers confidential.

49. Section 6 of the License Agreement precludes Lilly from divulging or providing such confidential information or material to any third party other than to an "Affiliate" (as defined in Section 1.14 of the License Agreement) or a "Sublicensee" (an entity to which licenses or sublicenses had been extended in accordance with Section 3.3 of the License Agreement).

50. Under Section 6.2 of the License Agreement, Lilly agreed not to make use of

any confidential information or material disclosed under the License Agreement "except as required or authorized under this Agreement."

### *Phillips' Transfer of the Pichia Technology to Lilly Under the License Agreement*

51. Section 2 of the License Agreement lists the obligations of the licensor (then Phillips) in transferring the licensed technology to Lilly.

52. Under Section 2 of the License Agreement, Phillips agreed to provide to Lilly the Host Strain and Expression Vectors within 90 days of the date of execution of the Licensee Agreement, and to provide Lilly a procedures manual containing information sufficient to create the Expression Systems and produce Product or Reagent using those Expression Systems.

53. Under Section 2 of the License Agreement, Phillips further agreed to provide information relating to the fermentation of the Host Strain and on-going consultation at Lilly's request.

54. Starting on or about April 5, 1990, and continuing through 1992, Phillips transferred to Lilly—subject to the License Agreement's obligations of confidentiality and limited use—Proprietary Information comprising certain Pichia strains, plasmids containing DNA for use in Pichia, and related technical information, techniques, training materials, and documentation.

55. In September 1991, representatives of Lilly visited Phillips to engage in technical discussions related to the Pichia Technology.

56. In 1992, Phillips transferred to Lilly additional Pichia strains, subject to the License Agreement's obligations of confidentiality and limited use.

57. One of the strains transferred to Lilly in 1992 was the MC100-3 strain ("MC100-3").

58. Also in 1992, Phillips transferred additional technical information related to MC100-3 (the "MC100-3 Information") to Lilly, subject to the License Agreement's obligations of confidentiality and limited use.

7

59. MC100-3 and the MC100-3 Information were and are Proprietary Information.

60. MC100-3 and the MC100-3 Information were trade secrets of Phillips and were and are trade secrets of RCT.

61. To facilitate Lilly's use of the Pichia Technology under the License Agreement, Phillips provided training to Lilly's personnel on multiple occasions between 1990 and 1992.

62. All Proprietary Information disclosed during the training sessions was subject to the confidentiality and limited use provisions of the License Agreement.

63. Phillips fully performed its obligations under Section 2 of the License Agreement.

64. Phillips and RCT fully performed their obligations under the License Agreement.

### *Lilly's Reporting and Royalty Obligations*

65. Section 5 of the License Agreement, entitled "Reports, Records and Inspection," enumerates Lilly's reporting and record-keeping obligations under the License Agreement.

66. Under Section 5.1 of the License Agreement, Lilly agreed periodically to "render to Phillips … a written statement setting forth the amount of Product sold in the particular Calendar Quarter Year, the Net Sales Price of each Product or Reagent sold, the savings resulting from the use of Reagent and the total royalties payable."

67. Section 4 of the License Agreement provides a formula for the calculation of royalties to be paid by Lilly in connection with Lilly's use of the Pichia Technology.

68. Pursuant to Sections 4 and 5 of the License Agreement, Lilly's royalty payments are based, among other things, on Lilly's periodic reports of the amount of Product and Reagent used, produced, and sold.

69. Under Section 4.4 of the License Agreement, Lilly agreed to pay a minimum

of $30,000 per year in royalties and maintenance fees.

### *Lilly's Right to Sublicense the Pichia Technology*

70. Section 3 of the License Agreement specifies the conditions under which Lilly may extend the licenses under the License Agreement or extend sublicenses.

71. Section 3.2 of the License Agreement specifies the circumstances under which Lilly may extend the licenses granted under the License Agreement to an "Affiliate" (as defined in Section 1.14 of the License Agreement).

72. Section 3.3 of the License Agreement specifies the circumstances under which Lilly may extend a sublicense to a third party.

73. Under Section 3.3 of the License Agreement, Lilly may sublicense the Pichia Technology to a third party *only* to make "Product" or "Reagent" for Lilly or an "Affiliate" of Lilly, as these terms are defined in the License Agreement.

74. Under Section 3.3 of the License Agreement, Lilly may sublicense the Pichia Technology to a third party only at such times that Lilly is not in material default under the License Agreement.

75. Section 3.3 of the License Agreement further provides that Lilly must notify RCT promptly, and in writing, if it extends a sublicense to any third party.

76. Under Section 3.3 of the License Agreement, the operations of a sublicensee are deemed to be the operations of Lilly.

77. Under Section 3.3 of the License Agreement, Lilly must account to RCT for the operations of any sublicensee.

78. Under Section 3.3 of the License Agreement, Lilly is primarily responsible for the performance by any sublicensee of its obligations under the License Agreement.

79. The License Agreement does not permit Lilly to transfer the Pichia Technology to a third party, except as specifically provided in Section 3 of the License Agreement.

80. The License Agreement does not permit Lilly to enter into a manufacturing

9

agreement with a third party that entails the third party's use of the Pichia Technology, unless the third party either is an "Affiliate" (as defined in Section 1.14 of the License Agreement) or a "Sublicensee" under Section 3.3 of the License Agreement.

### *Lilly's Misuse of the Pichia Technology*

81. Upon information and belief, since at least 2001, Lilly has used the Pichia Technology, including the MC100-3 strain, to produce porcine Carboxypeptidase-B ("CpB") for commercial purposes.

82. CpB is an enzyme used in the production of insulin and other pharmaceutical products.

83. CpB can be produced in a Pichia expression system using the Pichia Technology.

84. CpB also may be used to process pharmaceutical products that are produced in an expression system other than Pichia, such as *E. coli*.

85. On or about March 1, 2001, Lilly entered in a manufacturing agreement (the "Manufacturing Agreement") with Sandoz GmbH ("Sandoz"), then known as BioChemie GmbH, to produce certain proteins, enzymes, and other chemicals.

86. Under the Manufacturing Agreement, Lilly contracted with Sandoz to manufacture for Lilly CpB using the Pichia Technology.

87. Sandoz was not and is not an Affiliate of Lilly.

88. Lilly did not extend a sublicense to Sandoz to use the Pichia Technology.

89. Lilly provided the Pichia Technology to Sandoz under the Manufacturing Agreement.

90. Lilly provided Proprietary Information to Sandoz under the Manufacturing Agreement.

91. On or about January 1, 2007, Lilly and Sandoz extended the term of the Manufacturing Agreement.

92. Lilly did not notify RCT in writing that it had purported to transfer the Pichia

Technology to Sandoz.

93. Lilly did not otherwise seek RCT's consent to the transfer of the Pichia Technology to Sandoz.

94. Lilly has extended sublicenses to use the Pichia Technology to third parties and, on those occasions, Lilly has informed RCT of its actions. By way of example:

    a.  In an undated letter from Lilly's patent attorney that RCT received, upon information and belief, in 2007 or 2008, Lilly notified RCT that Lilly extended a sublicense to AMBRX, Inc. ("AMBRX") under the License Agreement. Lilly represented that AMBRX was serving as a third party to make Reagent solely for Lilly; and

    b.  On several occasions between 2004 and 2006, Lilly notified RCT in writing that Lilly extended non-commercial sublicenses to academic institutions for research purposes, under the terms of the License Agreement.

95. On information and belief, since at least 2001, Sandoz has produced for Lilly CpB that was expressed in Pichia, using the Pichia Technology.

96. On information and belief, since at least 2001, Lilly used CpB expressed in Pichia, using the Pichia Technology, for commercial purposes.

97. On information and belief, since at least 2003, Lilly used the Pichia-expressed CpB in the production process of the active pharmaceutical ingredients for its commercial insulin products Humulin (human insulin), Humalog (insulin lispro, an analog of human insulin), and r-glucagon (recombinant glucagon), collectively referred to as the "APIs."

98. The APIs were produced by an *E. coli* expression system.

99. The APIs were not produced by a Pichia expression system, using the Pichia Technology and, as such, are not "Products" under the License Agreement.

100. Because Lilly did not use the Sandoz-produced CpB in the manufacture or development of a "Product," CpB was not a "Reagent" under the License Agreement.

101. Because the CpB Sandoz manufactured was neither a "Reagent" nor a "Product," Lilly has no right or authority under the License Agreement to use that CpB in

1 manufacturing the APIs.

2  102. Throughout the term of the License Agreement, Lilly has provided annual reports to Phillips and RCT representing that it has not used the Pichia Technology in a royalty-bearing way, and instead paid the minimum maintenance fee of $30,000.

103. In or about December, 2012, in a letter to RCT, Lilly's Corporate Counsel stated on Lilly's behalf that "Lilly has never sold a Product as that term is defined in the Agreement."

104. On or about October 29, 2015, during a telephone conversation with Lilly's Assistant General Patent Counsel, Lilly first disclosed to RCT that it was using the Pichia Technology for a purpose not previously disclosed to RCT, related to the manufacture of insulin.

105. On or about November 25, 2015, Lilly's Assistant General Patent Counsel confirmed those facts among others in a letter to RCT.

106. Because Lilly previously had never reported that use of the Pichia Technology and, indeed, reported it had made no royalty-bearing use of the Pichia Technology, RCT could not have known and did not know that Lilly had provided Sandoz with access to the Pichia Technology or the commercial use Sandoz was making of the Pichia Technology.

### *Lilly's Use of the Pichia Technology Exceeded the Scope of the License Agreement*

107. Any human pharmaceutical produced by an *E. coli* expression system is not "Product," as the term "Product" is defined in the License Agreement.

108. Any human pharmaceutical produced by an *E. coli* expression system is not "produced by an Expression System," as that phrase is used in the License Agreement, because an Expression System must be one based on the Host Strains containing an Expression Vector.

109. The APIs are, therefore, not "Product" under the License Agreement.

110. The CpB produced by Sandoz for Lilly under the Manufacturing Agreement is not "Product," as defined in Section 1 of the License Agreement, because it is not a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate consumer.

111. CpB produced in Pichia, using the Pichia Technology, for use in the production of Lilly's APIs is not a "Reagent," as that term is defined in Section 1 of the License Agreement, because it is neither used in the manufacture or development of "Product," *viz.*, a human pharmaceutical produced by an Expression System, nor used for research purposes.

112. Accordingly, the CpB produced by Lilly, or on Lilly's behalf under the Manufacturing Agreement, is not a "Reagent," as that term is defined in Section 1.8 of the License Agreement.

113. The License Agreement grants Lilly no right or authority to manufacture or produce CpB for use in manufacturing the APIs because the CpB manufactured by Sandoz for Lilly is neither a "Reagent" nor a "Product."

114. Lilly's use of the Pichia Technology to produce CpB exceeded the scope of its license under the License Agreement, whether the CpB was produced directly by Lilly or on Lilly's behalf under the Manufacturing Agreement.

115. Lilly's use of the Pichia Technology to produce CpB materially breached the License Agreement.

## COUNT I
## BREACH OF CONTRACT –
## EXCEEDING SCOPE OF LICENSE

116. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

117. The License Agreement constitutes a binding contract between Lilly and RCT, as successor-in-interest to Phillips.

118. In Section 6.2 of the License Agreement, Lilly expressly agreed that it would not make any use of any confidential information or material, except as authorized under

the License Agreement.

119. Lilly has breached its express and implied obligations not to use the licensed technology in a manner that exceeds the scope of the license.

120. As a direct and proximate result of Lilly's breach of the License Agreement, RCT has incurred substantial losses, costs, and damages in an amount to be proven at trial.

121. RCT is entitled to recover its reasonable attorneys' fees and costs pursuant to Section 7 of the License Agreement and any applicable law, including, but not limited to, A.R.S. § 12-341.01.

## COUNT II
## BREACH OF CONTRACT –
## CONFIDENTIALITY AND SUB-LICENSING

122. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

123. Until October 29, 2015, Lilly never informed RCT that it had entered into the Manufacturing Agreement with Sandoz.

124. Lilly's actions in providing Sandoz with access to the Pichia Technology breached the provisions of Section 3 of the License Agreement.

125. The License Agreement imposes on Lilly secrecy obligations, including the duty to treat all information considered confidential by RCT as secret, and to refrain from providing or divulging such information to any third party other than an "Affiliate" (as defined in Section 1 of the License Agreement) or a "Sublicensee" (to whom a sublicense has been extended in accordance with Section 3.3 of the License Agreement).

126. Lilly's actions in providing Sandoz with the Host Strains, the Expression Vectors, and other Expression Technology, including Pichia strain MC100-3, and in divulging to Sandoz related confidential information, including the Proprietary Information, were in breach of Section 6.2 of the License Agreement.

127. As a direct and proximate result of Lilly's breach of the License Agreement, RCT has incurred substantial losses, costs, and damages in an amount to be proven at trial.

128. RCT is entitled to recover its reasonable attorneys' fees and costs pursuant to Section 7 of the License Agreement and any applicable law, including, but not limited to, A.R.S. § 12-341.01.

### COUNT III
### BREACH OF CONTRACT – REPORTING AND PAYMENT

129. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

130. Section 5 of the License Agreement imposes on Lilly the obligation to provide RCT with periodic reports that include the amount of "Product" or "Reagent" sold during the period, the proceeds derived from the sale of such Product or Reagent, the savings resulting from the use of Reagent and the total royalties payable.

131. To the extent Lilly's production of CpB constituted production of "Reagent," Lilly has breached its reporting obligations in failing to disclose its CpB production until October 2015 and to pay the royalties due thereunder.

132. As a direct and proximate result of Lilly's breach of the License Agreement, RCT has incurred substantial losses, costs, and damages in an amount to be proven at trial.

133. RCT is entitled to recover its reasonable attorneys' fees and costs pursuant to Section 7 of the License Agreement and any applicable law, including, but not limited to, A.R.S. § 12-341.01.

### COUNT IV
### BREACH OF CONTRACT – IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

134. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

135. Lilly breached the covenant of good faith and fair dealing implied in the License Agreement by:

    a. failing to disclose to RCT for nearly 15 years that it has provided the Expression Technology to Sandoz for the production of CpB and divulged related

Proprietary Information to Sandoz;

  b. failing to disclose to RCT for nearly 15 years that it has used the CpB produced in the Pichia Expression System in the production of its insulin APIs, which are expressed in *E. coli*;

  c. exceeding its authority under the License Agreement; and

  d. failing, for nearly 15 years, to pay RCT a reasonable royalty and/or otherwise compensate RCT for Lilly's unlicensed use of its Expression Technology.

  136. As a direct and proximate result of Lilly's breach of the implied covenant of good faith and fair dealing under the License Agreement, RCT has incurred substantial losses, costs, and damages in an amount to be proven at trial.

  137. RCT is entitled to recover its reasonable attorneys' fees and costs pursuant to Section 7 of the License Agreement and any applicable law, including, but not limited to, A.R.S. § 12-341.01.

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS

  138. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

  139. RCT owns the Proprietary Information.

  140. The Proprietary Information was designated and treated as secret by Phillips and RCT.

  141. The Proprietary Information is not generally known and cannot be readily ascertainable by proper means.

  142. The Proprietary Information derives independent economic value from not being generally known to, and not readily ascertainable by, other persons who can obtain economic value from its disclosure or use.

  143. Phillips and RCT have undertaken reasonable efforts to maintain the secrecy of the Proprietary Information, including, but not limited to, disclosing any aspects of the

Proprietary Information to third parties only under license agreements imposing use restrictions and imposing obligations of confidentiality.

144. The Proprietary Information constitutes trade secrets, pursuant to A.R.S. § 44-401 and Ind. Code § 24-2-3-2.

145. Lilly acquired the Proprietary Information under circumstances giving rise to a duty to maintain its secrecy, including, but not limited to, the express secrecy provisions in the License Agreement.

146. Lilly's misuse of the Proprietary Information was without RCT's express or implied consent.

147. Lilly has misappropriated RCT's trade secrets, pursuant to A.R.S. § 44-401 and Ind. Code § 24-2-3-2.

148. As a direct result of the misappropriation, Lilly was unjustly enriched.

149. As a direct result of the misappropriation, RCT suffered damages in an amount to be proven at trial.

150. On information and belief, Lilly's actions in failing to disclose its continuing commercial and profitable use of the Pichia Technology to RCT were conscious, intentional, and willful, done to unjustly enrich Lilly at the expense of RCT, justifying an award of exemplary damages and reasonable attorneys' fees, pursuant to A.R.S. § 44-403 and Ind. Code §§ 24-2-3-4 and 24-2-3-5.

151. Lilly is further obligated to reimburse RCT for all costs and attorneys' fees RCT incurs in prosecuting this action, under Section 7 of the License Agreement.

### COUNT VI
### CONVERSION

152. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

153. Since at least 2003, Lilly has exercised unauthorized and wrongful control over the Host Strain provided under the License Agreement, including the MC100-3 strain.

154. Lilly was well aware of the proprietary and confidential nature of the MC100-3 strain.

155. Lilly was well aware that its actions were not authorized and exceeded the scope of the License Agreement.

156. Lilly has knowingly or intentionally exerted unauthorized control over the Host Strain, including the MC100-3 strain.

157. As a direct result of its continuing conversion, Lilly was unjustly enriched.

158. As a direct result of the conversion by Lilly, RCT suffered damages in an amount to be proven at trial.

159. Lilly is further obligated to reimburse RCT for all costs and attorneys' fees it incurs in prosecuting this action, under Section 7 of the License Agreement.

## COUNT VII
## UNJUST ENRICHMENT

160. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

161. As a result of their actions, Lilly has been unjustly enriched at the expense of RCT.

162. Lilly should be required to account for all monies, profits, and gains which it has obtained or will unjustly obtain in the future at RCT's expense, and a constructive trust should be imposed thereon for the benefit of RCT.

## COUNT VIII
## INDEMNITY

163. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

164. Pursuant to Section 7 of the License Agreement, Lilly agreed "to indemnify and hold harmless" RCT as successor-in-interest to Phillips, "from and against any and all claims, demands, actions, liabilities, judgments, costs and expenses of whatever arising

18

from acts of [Lilly], whether based on contract, negligence, strict liability, or statutory liability, including without limitation, attorney's fees and cost of defense arising out of or related in any way to the production, use or sale of Product and Reagent..."

165. RCT was forced to bring this action as a result of Lilly's wrongful acts, and has incurred significant costs and attorneys' fees as a result.

166. Lilly is obligated to reimburse RCT for all the costs and attorneys' fees it incurs in prosecuting this action.

**WHEREFORE**, RCT respectfully requests that the Court enter judgment against Lilly in RCT's favor, as follows:

A. For compensatory damages in an amount to be proven at trial;

B. For a constructive trust upon Lilly's profits and gains for the benefit of RCT;

C. Ordering Lilly prospectively to comply with the terms of the License Agreement and not to exceed the scope of its license under the License Agreement;

D. Requiring Lilly to indemnify and reimburse RCT for any costs and attorneys' fees RCT incurs in connection with this matter pursuant to Section 7 of the License Agreement;

E. For an award of costs pursuant to Ariz. Rev. Stat. §§ 12-341 and 13-2312, Ind. Code § 34-52-1-1, and/or Section 7 of the License Agreement;

F. For an award of reasonable attorney's fees pursuant to A.R.S. §§ 12-341.01 and 13-2312 and Ind. Code §§ 24-2-3-4 and 24-2-3-5; and

G. All such other relief the Court deems just and proper.

Respectfully submitted this 4th day of April, 2016.

                    **RUSING LOPEZ & LIZARDI, P.L.L.C.**

                    Michael J. Rusing
                    Sivan R. Korn
                    Sarah S. Letzkus
                    *Attorneys for Plaintiff*

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

STATE OF ARIZONA )
) ss.
COUNTY OF PIMA )

## VERIFICATION

The undersigned, being first duly sworn, states:

1. I am the President of Research Corporation Technologies, Inc., Plaintiff in the above-entitled action.

2. I have read the foregoing Verified Complaint, and know the contents thereof.

3. All allegations therein are true in substance and in fact, and all statements therein are accurate and complete to the best of my knowledge and belief, except as to these matters which are stated upon information and belief, and as to these matters, I believe them to be true.

_____
Shaun A. Kirkpatrick

On April 4, 2016, before me, a Notary Public in and for said County and State, personally appeared SHAUN A. KIRKPATRICK, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledgment to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

Kieran S. Fasse
Notary Public - Arizona
Pima County
My Commission Expires
February 29, 2020