FILED _____ LODGED
_____ RECEIVED _____ COPY

OCT 1 9 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1  **RUSING LOPEZ & LIZARDI, P.L.L.C.**
2  6363 North Swan Road, Suite 151
   Tucson, Arizona 85718
   Telephone: (520) 792-4800
3
4  Michael J. Rusing
   State Bar No. 006617
   mrusing@rllaz.com
5  Sivan R. Korn
   State Bar No. 024231
6  skorn@rllaz.com
7  Sarah S. Letzkus
   State Bar No. 027314
   sletzkus@rllaz.com
8
   *Attorneys for Plaintiff*
9
10              **UNITED STATES DISTRICT COURT**
                 **FOR THE DISTRICT OF ARIZONA**
11
   Research Corporation Technologies, Inc., a
12 Delaware nonstock corporation,
                                          **Case No. 4:16-cv-0191-TUC-FRZ**
13              Plaintiff,
                                          **FIRST AMENDED COMPLAINT**
14      vs.
15 Eli Lilly and Company, an Indiana       **(Filed Under Seal)**
   corporation,
16
                                          Assigned to: Honorable Frank R. Zapata
17              Defendant.
18
19      For its Complaint against Eli Lilly and Company ("Lilly"), Research Corporation
20 Technologies, Inc. ("RCT") states and alleges as follows:
21              **PARTIES, JURISDICTION AND VENUE**
22      1.      RCT is a nonstock corporation organized and existing under the laws of the
23 State of Delaware, with its principal place of business in Tucson, Arizona.
24      2.      Lilly is a corporation organized and existing under the laws of the State of
25 Indiana, with its principal place of business in Indianapolis, Indiana.
26      3.      Lilly is a global pharmaceutical company.
27      4.      Lilly has qualified to transact business in Arizona, maintains a statutory
28 agent for service of process in Arizona, and has employees and agents in Arizona.

5.   Upon information and belief, Lilly maintains an office in Arizona, engages in lobbying efforts in Arizona, pays royalties in Arizona, and markets and has millions of dollars in annual revenues from sales of its products in Arizona.

6.   At all times relevant to RCT's claims, Lilly acted through its duly appointed agents, who were acting on Lilly's behalf and within the scope of their actual, express, implied, or apparent authority.

7.   This Court has personal jurisdiction over Lilly due to its continuous and systematic contacts with the State of Arizona.

8.   This Court also has personal jurisdiction over Lilly because Lilly engaged in intentional and wrongful conduct aimed at RCT, causing damage to RCT in Arizona.

9.   This Court has subject matter jurisdiction over RCT's claims under 28 U.S.C. § 1332, as RCT and Lilly are citizens of different states, and the amount in controversy exceeds the jurisdictional amount of $75,000.

10.   This Court also has subject matter jurisdiction under 18 U.S.C. § 1836(c) over RCT's claims in Count VI and supplemental jurisdiction over RCT's remaining claims.

11.   Venue is proper in this district under 28 U.S.C. § 1391(b)(3) and (c)(3).

### *The Technology at Issue*

12.   *Pichia pastoris* ("Pichia") is a species of methylotrophic yeast.

13.   In 1980s and early 1990s, researchers at the Phillips Petroleum Company ("Phillips") engineered strains of Pichia and associated genetic vectors, tools, and components for use with those strains, and developed methods of using the strains and components to produce proteins and other chemicals using recombinant DNA techniques in which Pichia acts as a host cell (collectively, the "Pichia Technology").

14.   The Pichia Technology can be used in the production of protein-based pharmaceutical products, such as insulin.

15.   The Pichia Technology can also be used to express enzymes (a type of protein) and other molecules that, in turn, are used in the production of protein-based

pharmaceutical products, which are themselves produced by either a Pichia expression system or another expression system.

16.    Certain aspects of the Pichia Technology are the subject of patents issued by the United States Patent and Trademark Office and patents issued by foreign patent authorities (the "Patent Rights").

17.    Other aspects of the Pichia Technology are, and have been, designated and treated as confidential information and trade secrets (the "Proprietary Information").

18.    The Proprietary Information, as further identified in Paragraphs 47-53, *infra*, has been and remains not generally known and not readily ascertainable by proper means.

19.    The Pichia Technology, as deployed using the Proprietary Information, offers technical, economic, and other advantages, such as increased efficiency, quantity, and quality, over other expression systems, including other yeast and bacteria-based expression systems.

20.    For example, proteins produced using the Pichia Technology have characteristics that render them more suitable for use as pharmaceuticals, or require fewer processing steps to extract them from the supernatant containing the cells of the Pichia strains producing the proteins.

21.    On or about September 23, 1993, Phillips sold, assigned, and transferred to RCT the Pichia Technology, the Patent Rights, the Proprietary Information, and all related intellectual property rights owned or controlled by Phillips, as well as all related licenses granted to or by Phillips (collectively, the "Pichia Estate").

22.    Although Phillips and RCT have disclosed aspects of the Proprietary Information to third parties under license agreements related to the Pichia Technology, each such disclosure was made under contracts imposing use restrictions and obligations of confidentiality on the receiving party.

### *The Lilly License Agreement*

23.    On or about April 4, 1990, Phillips and Lilly entered into a non-exclusive License Agreement (the "License Agreement"), in which Phillips granted Lilly certain

-3-

1   specified rights to the Pichia Estate.

2       24.    Phillips and Lilly amended the License Agreement on or about March 7,

3   1991.

4       25.    A complete and accurate copy of the License Agreement, as amended, is

5   attached as Exhibit A.

6       26.    On or about September 23, 1993, RCT succeeded to Phillips' rights under

7   the License Agreement.

8   ***The Scope of the License***

9       27.    Under Section 3.1.1 of the License Agreement, Lilly was granted:

10
11   [a] license under the Patent Rights to produce Product or
      Reagent throughout the Territory, use Product or Reagent for
      research purposes, or sell the thus produced Product or Reagent
12   for use in humans or for diagnostic purposes related to human
      medicine or for animal therapeutics or diagnostics throughout
13   the Territory.

14       28.    Under Section 3.1.2 of the License Agreement, Lilly also was granted:

15
16   [a] license to use Expression Technology to produce Product or
      Reagent throughout the Territory, use Product or Reagent for
      research purposes, or sell the thus produced Product or Reagent
17   for use in humans or for diagnostic purposes related to human
      medicine or for animal therapeutics or diagnostics throughout
18   the Territory.

19       29.    "Expression Technology" is defined in Section 1.9 of the License Agreement

20   to mean "Phillips technology and materials useful in the production of Product or

21   Reagent."

22       30.    "Reagent" is defined in Section 1.8 of the License Agreement to mean "a

23   material produced using the Expression Technology and which is used in the manufacture

24   or development of Product or which is used for research purposes."

25       31.    "Product" is defined in Sections 1.5, 1.6, and 1.7 of the License Agreement

26   to mean a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate

27   consumer and "which is produced by an Expression System."

28   . . .

32.   "Expression System" is defined in Section 1.3 of the License Agreement as "the Host Strain containing an Expression Vector which directs the production of Product or Reagent."

33.   "Host Strain" is defined in Section 1.1 of the License Agreement to mean a specific strain of Pichia, identified as GTS115, or other Pichia strains derived from the particular strain provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

34.   "Expression Vector" is defined in Section 1.2 of the License Agreement to mean certain vectors described in Attachment A to the License Agreement, or vectors derived from the vector provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

35.   The License Agreement granted Lilly the right under the Patent Rights solely: (a) to produce "Product" or "Reagent;" (b) to sell any "Product" or "Reagent" produced; or (c) to use "Product" or "Reagent" for research.

36.   The License Agreement granted Lilly the right to use the Expression Technology solely: (a) to produce "Product" or "Reagent;" (b) to sell any "Product" or "Reagent" produced; or (c) to use "Product" or "Reagent" for research.

37.   The License Agreement did not grant Lilly the right under the Patent Rights to produce any products other than "Product" or "Reagent," as defined in the License Agreement, except for research.

38.   The License Agreement did not grant Lilly the right to use the Expression Technology to produce any products other than "Product" or "Reagent," as defined in the License Agreement, except for research.

39.   A "Product" must be produced by an Expression System and a "Reagent" must be produced using the Expression Technology.

. . .

40.   A product that is not produced by an Expression System is not a "Product," as defined in the License Agreement.

41.   A material that is produced without use of the Expression Technology or, if produced with the Expression Technology, but which is not used either in the manufacture or development of Product or for research purposes, is not a "Reagent," as defined in the License Agreement.

***Phillips' Transfer of the Pichia Technology to Lilly Under the License Agreement***

42.   Section 2 of the License Agreement listed the obligations of the licensor (then Phillips) in transferring the licensed technology to Lilly.

43.   Under Section 2 of the License Agreement, Phillips agreed to provide to Lilly the Host Strain and Expression Vectors within 90 days of the date of execution of the Licensee Agreement, and to provide Lilly a procedures manual containing information sufficient to create the Expression Systems and produce Product or Reagent using those Expression Systems.

44.   Under Section 2 of the License Agreement, Phillips further agreed to provide information relating to the fermentation of the Host Strain and on-going consultation at Lilly's request.

45.   Starting on or about April 5, 1990, and continuing through 1992, Phillips transferred to Lilly—subject to the License Agreement's obligations of confidentiality and limited use—Proprietary Information comprising certain Pichia strains, plasmids containing DNA for use in Pichia, and related technical information, techniques, training materials, and documentation.

46.   In September 1991, representatives of Lilly visited Phillips to engage in technical discussions related to the Pichia Technology.

47.   In 1992, Phillips transferred to Lilly additional Pichia strains, subject to the License Agreement's obligations of confidentiality and limited use.

48.   One of the strains transferred to Lilly in 1992 was the MC100-3 strain ("MC100-3").

49.     Also in 1992, Phillips transferred additional technical information related to MC100-3 (the "MC100-3 Information") to Lilly, subject to the License Agreement's obligations of confidentiality and limited use.

50.     MC100-3 and the MC100-3 Information were and are Proprietary Information.

51.     MC100-3 and the MC100-3 Information were trade secrets of Phillips and were and are trade secrets of RCT.

52.     The compilation of Host Strains (including MC100-3), expression vectors, and plasmids (collectively the "Biological Materials") and technical knowledge provided to Lilly under the License Agreement were and are Proprietary Information.  The compilation of these components has not been and is not generally known, and cannot be readily ascertainable by proper means.

53.     Each component of the Proprietary Information provided to Lilly under the License Agreement, and the compilation of these components, was a trade secret of Philips and was and is a trade secret of RCT.

54.     To facilitate Lilly's use of the Pichia Technology under the License Agreement, Phillips provided training to Lilly's personnel on multiple occasions between 1990 and 1992.

55.     All Proprietary Information disclosed during the training sessions was subject to the confidentiality and limited use provisions of the License Agreement.

56.     Phillips fully performed its obligations under Section 2 of the License Agreement.

57.     Phillips and RCT fully performed their obligations under the License Agreement.

### *Confidentiality Obligations*

58.     Section 6 of the License Agreement, entitled "Secrecy," required Lilly to treat as secret all information and material that the licensor (initially Phillips and subsequently RCT) considered confidential.

59.     Section 6.2 of the License Agreement precluded Lilly from divulging or providing such confidential information or material to any third party other than to an "Affiliate" (as defined in Section 1.14 of the License Agreement) or a "Sublicensee" (an entity to which licenses or sublicenses had been extended in accordance with Section 3.3 of the License Agreement).

60.     Under Section 6.2 of the License Agreement, Lilly expressly agreed not to make use of any confidential information or material disclosed under the License Agreement "except as required or authorized under this Agreement."

### *Lilly's Right to Sublicense the Pichia Technology*

61.     Section 3 of the License Agreement specified the conditions under which Lilly could extend the licenses under the License Agreement to "Affiliates" or extend sublicenses to "Sublicensees."

62.     Section 3.2 of the License Agreement specified the circumstances under which Lilly could extend the licenses granted under the License Agreement to an "Affiliate" (as defined in the License Agreement).

63.     Section 3.3 of the License Agreement specified the circumstances under which Lilly could extend a sublicense to an unaffiliated third party.

64.     Under Section 3.3 of the License Agreement, Lilly could sublicense the Pichia Technology to an unaffiliated third party *only* to make "Product" or "Reagent" for Lilly or an "Affiliate" of Lilly, all as defined in the License Agreement.

65.     Under Section 3.3 of the License Agreement, Lilly could sublicense the Pichia Technology to an unaffiliated third party only at such times that Lilly was not in material default under the License Agreement.

66.     Under Section 3.3 of the License Agreement, Lilly could sublicense the Pichia Technology to an unaffiliated third party only through a written agreement with the sublicensee, in which the sublicensee accepted the terms of the sublicense.

67.     Under Section 3.3 of the License Agreement, Lilly was required to notify RCT promptly, and in writing, if it extended a sublicense to any unaffiliated third party.

68.     Under Section 3.3 of the License Agreement, the operations of a sublicensee were deemed to be the operations of Lilly.

69.     Under Section 3.3 of the License Agreement, Lilly was required to account to RCT for the operations of any sublicensee.

70.     Under Section 3.3 of the License Agreement, Lilly was primarily responsible for the performance by any sublicensee of its obligations under the License Agreement.

71.     The License Agreement did not permit Lilly to transfer the Pichia Technology to an unaffiliated third party except as specifically provided in Section 3 of the License Agreement.

### *Lilly's Misuse of the Pichia Technology:*
### *Wrongful Transfer of the Pichia Technology to Sandoz*

72.     Upon information and belief, since at least 2001, Lilly has used the Pichia Technology, including the Proprietary Information and the MC100-3 strain and MC100-3 Information, to produce porcine Carboxypeptidase-B ("CpB") for commercial purposes.

73.     CpB is an enzyme used in the production of insulin and other pharmaceutical products.

74.     CpB can be produced in a Pichia expression system using the Pichia Technology.

75.     CpB also may be used to process pharmaceutical products that are produced in an expression system other than Pichia, such as *E. coli*.

76.     On or about March 1, 2001, Lilly entered in a manufacturing agreement (the "Manufacturing Agreement") with Sandoz GmbH, then known as BioChemie GmbH ("Sandoz"), to produce certain proteins, enzymes, and other chemicals.

77.     On information and belief, Lilly provided the Pichia Technology to Sandoz so that Sandoz could manufacture CpB in its facility in Austria for Lilly under the Manufacturing Agreement.

78.     On information and belief, Lilly provided Sandoz with the Host Strains, the Expression Vectors, and other Expression Technology, including Pichia strain MC100-3.

79.     On information and belief, Lilly provided Proprietary Information to Sandoz under the Manufacturing Agreement.

80.     On information and belief, Sandoz manufactured CpB for Lilly under the Manufacturing Agreement.

81.     Sandoz was not and is not an "Affiliate" of Lilly, as defined in the License Agreement.

82.     Sandoz was not and is not a "Sublicensee" of Lilly, as defined in the License Agreement.

83.     On information and belief, Lilly did not enter into any written agreement with Sandoz purporting to extend a sublicense to Sandoz to use the Pichia Technology.

84.     The Manufacturing Agreement does not purport to extend a sublicense to Sandoz to use the Pichia Technology.

85.     Sandoz did not, in the Manufacturing Agreement, accept the terms of a sublicense of the Pichia Technology

86.     Rather than purporting to extend a sublicense for the Pichia Technology, the Manufacturing Agreement provided Lilly would "retain ownership of all information, documents and materials which Lilly" provided to Sandoz "in connection with the performance of this Agreement."

87.     Lilly did not notify RCT in writing that it had sublicensed the Pichia Technology to Sandoz.

88.     Lilly did not notify RCT in writing that it had transferred the Pichia Technology to Sandoz.

89.     Lilly did not otherwise seek RCT's consent to the transfer of the Pichia Technology to Sandoz.

90.     Lilly did not provide any accountings to RCT for Sandoz's operations under the Manufacturing Agreement.

91.     On or about January 1, 2007, Lilly and Sandoz extended the term of the Manufacturing Agreement.

92.    The License Agreement did not permit Lilly to enter into a manufacturing agreement with a third party that entailed the third party's use of the Pichia Technology, unless the third party either was an "Affiliate" (as defined in the License Agreement) or a "Sublicensee" under Section 3.3 of the License Agreement.

93.    Lilly has extended sublicenses to use the Pichia Technology to unaffiliated third parties other than Sandoz and, on those occasions, Lilly informed RCT of its actions. By way of example:

a.  In an undated letter from Lilly's patent attorney that RCT received, upon information and belief, in 2007 or 2008, Lilly notified RCT that Lilly extended a sublicense to AMBRX, Inc. under the License Agreement. Lilly represented that AMBRX was serving as a third party to make Reagent solely for Lilly; and

b.  On several occasions between 2004 and 2006, Lilly notified RCT in writing that Lilly extended non-commercial sublicenses to academic institutions for research purposes, under the terms of the License Agreement.

### Lilly's Misuse of the Pichia Technology: Exceeding the Scope of the License Agreement

94.    Lilly manufactures a number of commercial insulin products, including Humulin® (human insulin), Humalog® (insulin lispro, an analog of human insulin), and r-glucagon (recombinant glucagon) (collectively referred herein as Lilly's "Diabetes-Care Products"). The active pharmaceutical ingredients in Lilly's Diabetes-Care Products are collectively referred to herein as the "APIs."

95.    Lilly markets and sells its Diabetes-Care Products globally.

96.    On information and belief, since at least 2001, Sandoz has produced for Lilly CpB expressed in Pichia using the Pichia Technology.

97.    On information and belief, since at least 2001, Lilly used, for commercial purposes, CpB expressed in Pichia using the Pichia Technology.

98.   On information and belief, since at least 2003, Lilly used the Pichia-expressed CpB in the production process of the APIs for its Diabetes-Care Products.

99.   The Pichia-expressed CpB was an essential component in Lilly's process of manufacturing of the APIs.

100.   The CpB produced by Sandoz for Lilly under the Manufacturing Agreement was not "Product," as defined in the License Agreement, because it was not a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate consumer.

101.   Lilly produced the APIs with an *E. coli* expression system.

102.   Lilly did not produce the APIs with a Pichia expression system using the Pichia Technology.

103.   Because Lilly did not produce the APIs with a Pichia expression system using the Pichia Technology, the APIs were not "Products," as defined in the License Agreement.

104.   Human pharmaceuticals produced by an *E. coli* expression system were not "Products," as defined in the License Agreement.

105.   Human pharmaceuticals produced by an *E. coli* expression system were not "produced by an Expression System," as defined in the License Agreement, because an Expression System must be one based on the Host Strains containing an Expression Vector.

106.   CpB produced in Pichia, using the Pichia Technology, for use in the production of Lilly's APIs was not a "Reagent," as defined in the License Agreement, because it was neither used in the manufacture or development of a "Product," *viz.*, a human pharmaceutical produced by an Expression System, nor used for research purposes.

107.   Accordingly, the CpB produced by Lilly, or by Sandoz for Lilly under the Manufacturing Agreement, was not a "Reagent," as defined in the License Agreement.

108.   Because the CpB Sandoz manufactured was neither a "Reagent" nor a "Product," Lilly had no right or authority under the License Agreement to use that CpB in manufacturing the APIs.

1      109.   Lilly's use of the Pichia Technology to produce CpB exceeded the scope of

2   its license under the License Agreement, whether the CpB was produced directly by Lilly

3   or by Sandoz for Lilly under the Manufacturing Agreement.

4      110.   Lilly's use of the Pichia Technology to produce CpB materially breached the

5   License Agreement.

6                      ***Lilly's Reporting and Royalty Obligations***

7      111.   Section 4.4 of the License Agreement required Lilly to pay a minimum of

8   $30,000 per year in royalties and maintenance fees.

9      112.   Section 4 of the License Agreement provided formulae for calculating any

10   additional royalties to be paid by Lilly in connection with Lilly's use of the Pichia

11   Technology.

12      113.   Section 5 of the License Agreement, entitled "Reports, Records and

13   Inspection," enumerated Lilly's reporting and record-keeping obligations under the

14   License Agreement.

15      114.   Section 5.1 of the License Agreement required Lilly to periodically "render

16   to Phillips … a written statement setting forth the amount of Product sold in the particular

17   Calendar Quarter Year, the Net Sales Price of each Product or Reagent sold, the savings

18   resulting from the use of Reagent and the total royalties payable."

19      115.   Under Sections 4 and 5 of the License Agreement, Lilly's royalty payments

20   were based, among other things, on Lilly's periodic reports of the amount of Product and

21   Reagent used, produced, and sold.

22      116.   Throughout the term of the License Agreement in its periodic reports, Lilly

23   represented to Phillips and RCT that Lilly had not used the Pichia Technology in a royalty-

24   bearing way.

25      117.   Throughout the term of the License Agreement, Lilly paid the minimum

26   maintenance fee of $30,000.

27      118.   In or about December, 2012, in a letter to RCT, Lilly's Corporate Counsel

28   stated on Lilly's behalf that "Lilly has never sold a Product as that term is defined in the

1   Agreement."

2       119.   On or about October 29, 2015, during a telephone conversation with Lilly's

3   Assistant General Patent Counsel, Lilly disclosed to RCT that it was using the Pichia

4   Technology to manufacture CpB.

5       120.   On or about November 25, 2015, Lilly's Assistant General Patent Counsel

6   confirmed that fact, among others, in a letter to RCT.

7       121.   Before October 29, 2015, Lilly never reported to RCT that it had made

8   royalty-bearing use of the Pichia Technology.

9       122.   Before October 29, 2015, Lilly never reported to RCT that it had used the

10   Pichia Technology to produce "Reagent," as defined in the License Agreement.

11       123.   Before October 29, 2015, Lilly never reported to RCT any sales of

12   "Product," as defined in the License Agreement.

13       124.   Before October 29, 2015, Lilly never reported to RCT that Lilly gave Sandoz

14   access to the Pichia Technology.

15       125.   Before October 29, 2015, RCT had no reason to know that Lilly gave Sandoz

16   access to the Pichia Technology.

17       126.   Before October 29, 2015, RCT did not know that Lilly gave Sandoz access

18   to the Pichia Technology.

19       127.   Before October 29, 2015, Lilly never reported to RCT that Lilly was using

20   the Pichia Technology to manufacture Lilly's Diabetes-Care Products.

21       128.   Before October 29, 2015, RCT had no reason to know that Lilly was using

22   the Pichia Technology to manufacture Lilly's Diabetes-Care Products.

23       129.   Before October 29, 2015, RCT did not know that Lilly was using the Pichia

24   Technology to manufacture Lilly's Diabetes-Care Products.

25                  ***RCT's Termination of the License Agreement***

26       ***and Lilly's Breach of its Post-Termination Obligations***

27       130.   On or about April 4, 2016, RCT gave written notice to Lilly of its breaches

28   of the License Agreement (the "Default Notice").

131. Under Section 10.2 of the License Agreement, if Lilly defaulted or failed to perform any of the terms, obligations, or provisions of the License Agreement, RCT had the right, at its option, to cancel and terminate the License Agreement, and all licenses granted under it, if the default was not corrected within thirty days after written notice of default.

132. Lilly failed to cure its defaults under the License Agreement within thirty days after the Default Notice.

133. On June 29, 2016, RCT gave Lilly written notice that RCT was terminating the License Agreement, effective immediately, under Section 10.3 of the License Agreement ("the Termination Notice").

134. A complete and accurate copy of the Termination Notice is attached as Exhibit B.

135. RCT was entitled, under the terms of the License Agreement, to terminate the License Agreement because of Lilly's uncured breaches when RCT transmitted the Termination Notice to Lilly.

136. The License Agreement, and all licenses thereunder, terminated on or about June 29, 2016, when RCT gave Lilly the Termination Notice.

137. Under Section 10.1 of the License Agreement, the licenses granted under Article 3 of the License Agreement would become "irrevocable and fully paid" only upon "the expiration of the last to expire of the Patent Rights" and only if the License Agreement had not already been terminated.

138. The expiration date of the last to expire of the Patent Rights (Canadian Patent No. 1340733) was September 14, 2016.

139. Because RCT terminated the License Agreement before September 14, 2016, the licenses granted under Article 3 of the License Agreement did not become "irrevocable and fully paid."

140. Under Section 10.3 of the License Agreement, upon a termination of the License Agreement, Lilly was obligated to immediately cease using, and to return to RCT,

1   "all Host Strains, Expression Vectors and Expression Systems in Licensee's or an

2   Affiliate's or sublicensee's possession and any information relating to such."

3       141.   The Termination Notice demanded that Lilly immediately return to RCT all

4   Host Strains, Expression Vectors and Expression Systems and any information relating to

5   such material in the possession of Lilly, Sandoz, or any of Lilly's affiliates or sublicensees.

6       142.   Lilly failed to respond to the Termination Notice.

7       143.   On July 22, 2016, RCT sent Lilly another letter again demanding that Lilly

8   comply immediately with its obligations under Section 10.3 of the License Agreement (the

9   "July 22, 2016 Letter").

10       144.   A complete and accurate copy of the July 22, 2016 Letter is attached as

11   Exhibit C.

12       145.   Lilly failed to comply with the Termination Notice or with the July 22, 2016

13   Letter.

14       146.   On August 16, 2016, RCT sent Lilly yet another letter again confirming

15   RCT's termination of the License Agreement (the "August 16, 2016 Letter").

16       147.   A complete and accurate copy of the August 16, 2016 Letter is attached as

17   Exhibit D.

18       148.   Lilly failed to respond to the August 16, 2016 Letter.

19       149.   On information and belief, Lilly failed to take any action to comply with its

20   obligations under Section 10.3 of the License Agreement.

21       150.   On information and belief, Lilly, Sandoz, or Lilly's affiliates or sublicensees

22   continue to possess and use the Pichia Technology in the process of manufacturing Lilly's

23   APIs.

24       151.   Lilly materially breached its obligations under Section 10.3 of the License

25   Agreement.

26       152.   In both the Termination Notice and the July 22, 2016 Letter, RCT stated that,

27   to the extent Lilly was unable to identify or implement the use of an alternative source of

28   CpB, RCT would discuss with Lilly the terms under which Lilly might continue to use its

1  inventory of Pichia-produced CpB, such that Lilly's production of its Diabetes-Care

2  Products would not be disrupted.

3       153.   Lilly did not engage in discussion with RCT concerning Lilly's continued,

4  and now unlicensed, use of the Pichia Technology.

**COUNT I**
**BREACH OF CONTRACT –**
**EXCEEDING SCOPE OF LICENSE**

7       154.   RCT incorporates by reference the statements and allegations contained in

8  the preceding paragraphs as if set forth in full.

9       155.   The License Agreement constituted a binding contract between Lilly and

10  RCT, as successor-in-interest to Phillips.

11      156.   Lilly breached its obligation not to use the Pichia Technology in a manner

12  that exceeded the scope of its license.

13      157.   As a direct and proximate result of Lilly's breach of the License Agreement,

14  RCT incurred and continues to incur substantial losses, costs, and damages in an amount to

15  be proven at trial.

16      158.   RCT is entitled to recover its reasonable attorneys' fees and costs under

17  applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT II**
**BREACH OF CONTRACT –**
**CONFIDENTIALITY**

20      159.   RCT incorporates by reference the statements and allegations contained in

21  the preceding paragraphs as if set forth in full.

22      160.   Lilly breached Section 6.2 of the License Agreement by providing the Pichia

23  Technology and related confidential information (including the Proprietary Information) to

24  Sandoz, which was neither an "Affiliate" or a "Sublicensee," as defined in the License

25  Agreement.

26      161.   Alternatively, if Sandoz was a "Sublicensee," Lilly breached Section 3.3 of

27  the License Agreement.

28  . . .

162.   As a direct and proximate result of Lilly's breach of the License Agreement, RCT incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

163.   RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT III**
**BREACH OF CONTRACT –**
**REPORTING AND PAYMENT**

164.   RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

165.   To the extent Lilly used the Pichia Technology to produce "Reagent," Lilly breached its reporting obligations under the License Agreement and breached the License Agreement by failing to pay royalties when due.

166.   To the extent Lilly used the Pichia Technology to produce "Product," Lilly breached its reporting obligations under the License Agreement and breached the License Agreement by failing to pay royalties when due.

167.   As a direct and proximate result of Lilly's breaches of the License Agreement, RCT incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

168.   RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT IV**
**BREACH OF CONTRACT –**
**LILLY'S CONDUCT FOLLOWING**
**TERMINATION OF THE LICENSE AGREEMENT**

169.   RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

170.   After receiving the Termination Notice, Lilly's failure to immediately cease use of, and to return to RCT, all Host Strains, Expression Vectors, Expression Systems, and any information relating to such material in the possession of Lilly, its affiliates or

1  sublicensees, or Sandoz, breached Section 10.3 of the License Agreement.

2  171.   As a direct and proximate result of Lilly's breach of the License Agreement,

3  RCT has incurred and continues to incur substantial losses, costs, and damages in an

4  amount to be proven at trial.

5  172.   RCT is entitled to recover its reasonable attorneys' fees and costs under

6  applicable law, including, but not limited to, A.R.S. § 12-341.01.

7

8  **COUNT V**
**MISAPPROPRIATION OF TRADE SECRETS UNDER STATE LAW**

9  173.   RCT incorporates by reference the statements and allegations contained in

10  the preceding paragraphs as if set forth in full.

11  174.   RCT owns the Proprietary Information.

12  175.   The Proprietary Information was designated and treated as secret by Phillips

13  and RCT.

14  176.   The Proprietary Information is not generally known and cannot be readily

15  ascertained by proper means.

16  177.   The Proprietary Information derives independent economic value from being

17  not generally known to, and not readily ascertainable by, other persons who can obtain

18  economic value from its disclosure or use.

19  178.   Phillips and RCT have undertaken reasonable efforts to maintain the secrecy

20  of the Proprietary Information, including, but not limited to, by:  disclosing any aspects of

21  the Proprietary Information to third parties only under license agreements imposing use

22  restrictions and obligations of secrecy; requiring employees to maintain the confidentiality

23  of Proprietary Information; routinely monitoring publications and other public records to

24  identify potential misappropriation and unauthorized use of the Proprietary Information

25  and policing any identified unauthorized use.

26  179.   The Proprietary Information constitutes trade secrets, under both A.R.S. §

27  44-401 and Ind. Code § 24-2-3-2.

28  . . .

180. Lilly acquired the Proprietary Information under circumstances giving rise to a duty to maintain its secrecy, including, but not limited to, the express secrecy provisions in the License Agreement.

181. Lilly acquired the Proprietary Information under circumstances giving rise to a duty to limit its use, including, but not limited to, the express provisions in the License Agreement limiting Lilly's ability to use the Proprietary Information.

182. Lilly's disclosure of the Proprietary Information to Sandoz was without RCT's express or implied consent.

183. Lilly's use of the Proprietary Information outside the scope of the License Agreement was without RCT's express or implied consent.

184. Lilly misappropriated RCT's trade secrets, under both A.R.S. § 44-401 and Ind. Code § 24-2-3-2.

185. As a direct result of Lilly's misappropriation of RCT's trade secrets, RCT suffered and continues to suffer damages in an amount to be proven at trial.

186. As a direct result of the misappropriation, Lilly was unjustly enriched.

187. On information and belief, Lilly's misappropriation of RCT's trade secrets was willful and malicious, such that the Court may award RCT exemplary damages and reasonable attorneys' fees.

## COUNT VI
## MISAPPROPRIATION OF TRADE SECRETS UNDER FEDERAL LAW

188. RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

189. The Proprietary Information constitutes trade secrets under 18 U.S.C. § 1839.

190. At all times relevant to this Complaint, the Proprietary Information related to a product or service used in, or intended for use in, interstate or foreign commerce, as those terms are used in 18 U.S.C. § 1836(b)(1).

. . .

1    191.   Lilly acquired the Proprietary Information under circumstances giving rise to

2  a duty to limit its use, including, but not limited to, the express provisions in the License

3  Agreement limiting Lilly's ability to use the Proprietary Information.

4    192.   Lilly misappropriated RCT's trade secrets under 18 U.S.C.

5  §1839(5)(B)(ii)(II) by using the Proprietary Information beyond the scope of its license

6  under the License Agreement, from and after May 11, 2016.

7    193.   Lilly misappropriated RCT's trade secrets under 18 U.S.C.

8  §1839(5)(B)(ii)(II) by failing to immediately cease use of, and to return to RCT, all Host

9  Strains, Expression Vectors, Expression Systems, and any information relating to such

10  material in the possession of Lilly, its affiliates or sublicensees, or Sandoz, after receiving

11  the Termination Notice.

12    194.   As a direct result of Lilly's misappropriation of RCT's trade secrets, RCT

13  suffered and continues to suffer damages in an amount to be proven at trial.

14    195.   As a direct result of the misappropriation, Lilly was unjustly enriched.

15    196.   On information and belief, Lilly's misappropriation of RCT's trade secrets

16  was willful and malicious, such that the Court may award RCT exemplary damages and

17  reasonable attorneys' fees.

18

19                            **COUNT VII**
                             **CONVERSION**

20    197.   RCT incorporates by reference the statements and allegations contained in

21  the preceding paragraphs 1 through 153  as if set forth in full.

22    198.   Since at least 2003, Lilly has exercised unauthorized and wrongful control

23  over the Biological Materials and the non-tangible elements of the Pichia Technology.

24    199.   The Biological Materials are intrinsically valuable and unique, and cannot be

25  recreated or substituted with other biological materials.

26    200.   Lilly knew of the proprietary nature and inherent value of the Biological

27  Materials, and in particular the Host Strain including the MC100-3 strain, the vectors and

28  plasmids, and the non-tangible elements of the Pichia Technology.

1     201.    Lilly has knowingly or intentionally exerted unauthorized control over the

2  Biological Materials and the non-tangible elements of the Pichia Technology.

3     202.    Lilly continues to exert unauthorized control over the Biological Materials

4  and the non-tangible elements of the Pichia Technology.

5     203.    Lilly's conversion damaged and continues to damage RCT in an amount to

6  be proven at trial.

7

**COUNT VIII**

8               **UNJUST ENRICHMENT**

9     204.    RCT incorporates by reference the statements and allegations contained in

10  the preceding paragraphs 1 through 153 as if set forth in full.

11     205.    In addition, or in the alternative to RCT's contract-based claims, and without

12  waiving the foregoing, RCT alleges a claim for Lilly's unjust enrichment.

13     206.    Since at least 2003, Lilly has enriched itself and others by the unauthorized

14  and wrongful control over the Biological Materials and by the unauthorized use of the

15  Pichia Technology without RCT's permission.

16     207.    Lilly acted without RCT's knowledge or consent and knew its actions were

17  not authorized.

18     208.    At all times, there was no justification for Lilly's unjust enrichment and RCT

19  has been unjustly impoverished by Lilly's retaining money and other benefits without

20  payment or compensation to RCT.  As a direct result of its actions, Lilly has been unjustly

21  enriched at the expense of RCT.

22     209.    As a direct result of Lilly's actions, RCT has suffered and continues to suffer

23  harm, in that it provided the Biological Materials and the Pichia Technology to Lilly, but

24  was not compensated for the benefit it conferred.

25     210.    In the absence of a legal remedy, Lilly should be required to account for all

26  monies, profits, and gains and other benefits which it has unjustly obtained at Lilly's

27  expense and impoverishment and a constructive trust should be imposed thereon for the

28  benefit of RCT.

1       **WHEREFORE,** RCT respectfully requests that the Court enter judgment against

2   Lilly in RCT's favor, as follows:

3       A.    Awarding RCT compensatory damages in an amount to be proven at

4             trial;

5       B.    Awarding RCT exemplary damages in an amount to be proven at trial;

6       C.    Imposing a constructive trust upon Lilly's unjustly gained profits for

7             the benefit of RCT;

8       D.    Ordering Lilly to comply with its post-termination obligations under

9             the License Agreement;

10      E.    Awarding RCT its costs under Ariz. Rev. Stat. §§ 12-341 and 13-2312

11            and Ind. Code § 34-52-1-1;

12      F.    Awarding RCT its reasonable attorney's fees under A.R.S. §§ 12-

13            341.01 and 13-2312, Ind. Code §§ 24-2-3-4 and 24-2-3-5, and 18

14            U.S.C. § 1836(b)(3)(D); and

15      G.    All such other relief the Court deems just and proper.

16      Respectfully submitted this 19th day of October, 2016.

17                                      **RUSING LOPEZ & LIZARDI, P.L.L.C.**

18

19

20                                      Michael J. Rusing
                                        Sivan R. Korn
21                                      Sarah S. Letzkus
                                        *Attorneys for Plaintiff*
22

23

24

25

26

27

28

1

2

## CERTIFICATE OF SERVICE

3    I hereby certify that on the 19th day of October, 2016, a copy of the foregoing has been
filed with the Clerk of the court and a copy transmitted to the following parties via U.S. Mail.

4

5    Jeffrey Willis, Esq.
SNELL & WILMER L.L.P.
One S. Church Ave., Ste. 1500

6    Tucson, AZ 85701
(jwillis@swlaw.com)

7    *Attorneys for Defendant*

8

9    By: _____
Jason Linaman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28