Michael J. Rusing (AZ Bar No. 006617)
Sivan R. Korn (AZ Bar No. 024231)
Isaac S. Crum (AZ Bar No. 026510)
Sarah L. Letzkus (AZ Bar No. 027314)
**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
Email:   mrusing@rllaz.com
         skorn@rllaz.com
         icrum@rllaz.com
         sletzkus@rllaz.com

Veronica Mullally Munoz (Admitted *pro hac vice*)
Daniel J. Melman (Admitted *pro hac vice*)
Miriam Kurien Tyrell (Admitted *pro hac vice*)
**PEARL COHEN ZEDEK LATZER BARATZ LLP**
1500 Broadway
New York, New York 10036
Telephone: (646) 878-0800
Email:   vmunoz@pearlcohen.com

Kristoffer Leftwich (Admitted *pro hac vice*)
**CHEN MALIN LLP**
1700 Pacific Avenue, Suite 2400
Dallas, Texas 75201
Telephone: (214) 627-9950
Email:   kleftwich@chenmalin.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Research Corporation Technologies, Inc., a Delaware nonstock corporation, | **Case No. 4:16-cv-0191-TUC-FRZ** |
| Plaintiff, | |
| vs. | **FOURTH AMENDED COMPLAINT** |
| Eli Lilly and Company, an Indiana corporation, | |
| Defendant. | Assigned to: Honorable Frank R. Zapata |

For its Complaint against Eli Lilly and Company ("Lilly"), Research Corporation Technologies, Inc. ("RCT") states and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. RCT is a nonstock corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Tucson, Arizona.

2. Lilly is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana.

3. Lilly is a global pharmaceutical company.

4. Lilly has qualified to transact business in Arizona, maintains a statutory agent for service of process in Arizona, and has employees and agents in Arizona.

5. Upon information and belief, Lilly maintains an office in Arizona, engages in lobbying efforts in Arizona, pays royalties in Arizona, and markets and has millions of dollars in annual revenues from sales of its products in Arizona.

6. At all times relevant to RCT's claims, Lilly acted through its duly appointed agents, who were acting on Lilly's behalf and within the scope of their actual, express, implied, or apparent authority.

7. This Court has personal jurisdiction over Lilly due to its continuous and systematic contacts with the State of Arizona.

8. This Court also has personal jurisdiction over Lilly because Lilly engaged in intentional and wrongful conduct aimed at RCT, causing damage to RCT in Arizona.

9. This Court has subject matter jurisdiction over RCT's claims under 28 U.S.C. § 1332, as RCT and Lilly are citizens of different states, and the amount in controversy exceeds the jurisdictional amount of $75,000.

10. This Court also has subject matter jurisdiction under 18 U.S.C. § 1836(c) over RCT's claims in Count VI and supplemental jurisdiction over RCT's remaining claims.

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(3) and (c)(3).

### ***The Technology at Issue***

12. *Pichia pastoris* ("*Pichia*") is a species of methylotrophic yeast.

13. In 1980s and early 1990s, researchers at the Phillips Petroleum Company

("Phillips") engineered strains of *Pichia* and associated genetic vectors, tools, and components for use with those strains, and developed methods of using the strains and components to produce proteins and other chemicals using recombinant DNA techniques in which *Pichia* acts as a host cell (collectively, the "*Pichia* Technology").

14.     The *Pichia* Technology can be used in the production of protein-based pharmaceutical products, such as insulin.

15.     The *Pichia* Technology can also be used to express enzymes (a type of protein) and other molecules that, in turn, are used in the production of protein-based pharmaceutical products, which are themselves produced by either a *Pichia* expression system or another expression system.

16.     Certain aspects of the *Pichia* Technology are the subject of patents issued by the United States Patent and Trademark Office and patents issued by foreign patent authorities (the "Patent Rights").

17.     Other aspects of the *Pichia* Technology are, and have been, designated and treated as confidential information and trade secrets (the "Proprietary Information").

18.     The Proprietary Information, as further identified in Paragraphs 47-53, *infra*, has been and remains not generally known and not readily ascertainable by proper means.

19.     The *Pichia* Technology, as deployed using the Proprietary Information, offers technical, economic, and other advantages, such as increased efficiency, quantity, and quality, over other expression systems, including other yeast and bacteria-based expression systems.

20.     For example, proteins produced using the *Pichia* Technology have characteristics that render them more suitable for use as pharmaceuticals, or require fewer processing steps to extract them from the supernatant containing the cells of the *Pichia* strains producing the proteins.

21.     On or about September 23, 1993, Phillips sold, assigned, and transferred to RCT the *Pichia* Technology, the Patent Rights, the Proprietary Information, and all related intellectual property rights owned or controlled by Phillips, as well as all related licenses

1  granted to or by Phillips (collectively, the "*Pichia* Estate").

2      22.     Although Phillips and RCT have disclosed aspects of the Proprietary

3  Information to third parties under license agreements related to the *Pichia* Technology,

4  each such disclosure was made under contracts imposing use restrictions and obligations of

5  confidentiality on the receiving party.

6  ### *The Lilly License Agreement*

7      23.     On or about April 4, 1990, Phillips and Lilly entered into a non-exclusive

8  License Agreement (the "License Agreement"), in which Phillips granted Lilly certain

9  specified rights to the *Pichia* Estate.

10     24.     Phillips and Lilly amended the License Agreement on or about March 7,

11  1991.

12     25.     A complete and accurate copy of the License Agreement, as amended, is

13  attached as Exhibit A.

14     26.     On or about September 23, 1993, RCT succeeded to Phillips' rights under

15  the License Agreement.

16  ### *The Scope of the License*

17     27.     Under Section 3.1.1 of the License Agreement, Lilly was granted:

18      [a] license under the Patent Rights to produce Product or
19      Reagent throughout the Territory, use Product or Reagent for
    research purposes, or sell the thus produced Product or Reagent
20      for use in humans or for diagnostic purposes related to human
    medicine or for animal therapeutics or diagnostics throughout
21      the Territory.

22     28.     Under Section 3.1.2 of the License Agreement, Lilly also was granted:

23      [a] license to use Expression Technology to produce Product or
    Reagent throughout the Territory, use Product or Reagent for
24      research purposes, or sell the thus produced Product or Reagent
    for use in humans or for diagnostic purposes related to human
25      medicine or for animal therapeutics or diagnostics throughout
26      the Territory.

27     29.     "Expression Technology" is defined in Section 1.9 of the License Agreement

28  to mean "Phillips technology and materials useful in the production of Product or

-4-

Reagent."

30.     "Reagent" is defined in Section 1.8 of the License Agreement to mean "a material produced using the Expression Technology and which is used in the manufacture or development of Product or which is used for research purposes."

31.     "Product" is defined in Sections 1.5, 1.6, and 1.7 of the License Agreement to mean a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate consumer and "which is produced by an Expression System."

32.     "Expression System" is defined in Section 1.3 of the License Agreement as "the Host Strain containing an Expression Vector which directs the production of Product or Reagent."

33.      "Host Strain" is defined in Section 1.1 of the License Agreement to mean a specific strain of *Pichia*, identified as GTS115, or other *Pichia* strains derived from the particular strain provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

34.     "Expression Vector" is defined in Section 1.2 of the License Agreement to mean certain vectors described in Attachment A to the License Agreement, or vectors derived from the vector provided to Lilly under the License Agreement, or derived using information provided to Lilly by Phillips directly or indirectly under the License Agreement.

35.     The License Agreement granted Lilly the right under the Patent Rights solely: (a) to produce "Product" or "Reagent;" (b) to sell any "Product" or "Reagent" produced; or (c) to use "Product" or "Reagent" for research.

36.     The License Agreement granted Lilly the right to use the Expression Technology solely: (a) to produce "Product" or "Reagent;" (b) to sell any "Product" or "Reagent" produced; or (c) to use "Product" or "Reagent" for research.

37.     The License Agreement did not grant Lilly the right under the Patent Rights to produce any products other than "Product" or "Reagent," as defined in the License

1   Agreement.

2   38.     The License Agreement did not grant Lilly the right to use the Expression

3   Technology to produce any products other than "Product" or "Reagent," as defined in the

4   License Agreement.

5   ***Phillips' Transfer of the Pichia Technology to Lilly Under the License Agreement***

6   39.     Section 2 of the License Agreement listed the obligations of the licensor

7   (then Phillips) in transferring the licensed technology to Lilly.

8   40.     Under Section 2 of the License Agreement, Phillips agreed to provide to

9   Lilly the Host Strain and Expression Vectors within 90 days of the date of execution of the

10  Licensee Agreement, and to provide Lilly a procedures manual containing information

11  sufficient to create the Expression Systems and produce Product or Reagent using those

12  Expression Systems.

13  41.     Under Section 2 of the License Agreement, Phillips further agreed to provide

14  information relating to the fermentation of the Host Strain and on-going consultation at

15  Lilly's request.

16  42.     Starting on or about April 5, 1990, and continuing through 1992, Phillips

17  transferred to Lilly—subject to the License Agreement's obligations of confidentiality and

18  limited use—Proprietary Information comprising certain *Pichia* strains, plasmids

19  containing DNA for use in *Pichia*, and related technical information, techniques, training

20  materials, and documentation.

21  43.     In September 1991, representatives of Lilly visited Phillips to engage in

22  technical discussions related to the *Pichia* Technology.

23  44.     In 1992, Phillips transferred to Lilly additional *Pichia* strains, subject to the

24  License Agreement's obligations of confidentiality and limited use.

25  45.     One of the strains transferred to Lilly, subject to the License Agreement's

26  obligations, was the SMD1163 strain ("SMD1163").

27  46.     In 1992, Phillips transferred additional technical information related to

28  SMD1163 (the "SMD1163 Information") to Lilly, subject to the License Agreement's

obligations of confidentiality and limited use.

47.     SMD1163 and the SMD1163 Information were and are Proprietary Information.

48.     The compilation of Host Strains (including SMD1163), expression vectors, and plasmids (collectively the "Biological Materials") and technical knowledge provided to Lilly under the License Agreement were and are Proprietary Information.

49.     To facilitate Lilly's use of the *Pichia* Technology under the License Agreement, Phillips provided training to Lilly's personnel on multiple occasions between 1990 and 1992.

50.     All Proprietary Information disclosed during the training sessions was subject to the confidentiality and limited use provisions of the License Agreement.

51.     Phillips fully performed its obligations under Section 2 of the License Agreement.

52.     Phillips and RCT fully performed their obligations under the License Agreement.

### *Confidentiality Obligations*

53.     Section 6 of the License Agreement, entitled "Secrecy," required Lilly to treat as secret all information and material that the licensor (initially Phillips and subsequently RCT) considered confidential.

54.     Section 6.2 of the License Agreement precluded Lilly from divulging or providing such confidential information or material to any third party other than to an "Affiliate" (as defined in Section 1.14 of the License Agreement) or a "Sublicensee" (an entity to which licenses or sublicenses had been extended in accordance with Section 3.3 of the License Agreement).

55.     Under Section 6.2 of the License Agreement, Lilly expressly agreed not to make use of any confidential information or material disclosed under the License Agreement "except as required or authorized under this Agreement."

### *Lilly's Right to Sublicense the Pichia Technology*

56. Section 3 of the License Agreement specified the conditions under which Lilly could extend the licenses under the License Agreement to "Affiliates" or extend sublicenses to "Sublicensees."

57. Section 3.2 of the License Agreement specified the circumstances under which Lilly could extend the licenses granted under the License Agreement to an "Affiliate" (as defined in the License Agreement).

58. Section 3.3 of the License Agreement specified the circumstances under which Lilly could extend a sublicense to an unaffiliated third party.

59. Under Section 3.3 of the License Agreement, Lilly could sublicense the *Pichia* Technology to an unaffiliated third party ***only*** to make "Product" or "Reagent" for Lilly or an "Affiliate" of Lilly, all as defined in the License Agreement.

60. Under Section 3.3 of the License Agreement, Lilly could sublicense the *Pichia* Technology to an unaffiliated third party only at such times that Lilly was not in material default under the License Agreement.

61. Under Section 3.3 of the License Agreement, Lilly could sublicense the *Pichia* Technology to an unaffiliated third party only through a written agreement with the sublicensee, in which the sublicensee accepted the terms of the sublicense.

62. Under Section 3.3 of the License Agreement, Lilly was required to notify RCT promptly, and in writing, if it extended a sublicense to any unaffiliated third party.

63. Under Section 3.3 of the License Agreement, the operations of a sublicensee were deemed to be the operations of Lilly.

64. Under Section 3.3 of the License Agreement, Lilly was required to account to RCT for the operations of any sublicensee.

65. Under Section 3.3 of the License Agreement, Lilly was primarily responsible for the performance by any sublicensee of its obligations under the License Agreement.

66. The License Agreement did not permit Lilly to transfer the *Pichia* Technology to an unaffiliated third party except as specifically provided in Section 3 of the

License Agreement.

### *Lilly's Misuse of the Pichia Technology:*
### *Wrongful Transfer of the Pichia Technology to Sandoz*

67.     Upon information and belief, since at least 1997, Lilly has used the *Pichia* Technology, including the Proprietary Information and the SMD1163 strain and SMD1163 Information, to produce recombinant porcine Carboxypeptidase-B ("CpB") for commercial purposes.

68.     CpB is an enzyme used in the production of insulin and other pharmaceutical products.

69.     CpB can be produced in a *Pichia* expression system using the *Pichia* Technology.

70.     On or about March 1, 2001, Lilly entered in a manufacturing agreement (the "Manufacturing Agreement") with BioChemie GmbH, a subsidiary of Sandoz GmbH("Sandoz"), to produce certain proteins, enzymes, and other chemicals.

71.     On information and belief, Lilly provided the *Pichia* Technology, including but not limited to Host Strains and Expression Vectors, to Sandoz so that Sandoz could manufacture CpB in its facility in Austria for Lilly under the Manufacturing Agreement.

72.     On information and belief, Lilly provided Sandoz with the Host Strains, the Expression Vectors, and other Expression Technology.

73.     On information and belief, Lilly provided Sandoz with *Pichia* Strain SMD1163 transformed with an Expression Vector designated "pLDG43."

74.     pLDG43, the Expression Vector Lilly used to transform SMD1163, is derived from Expression Vectors Lilly received from Phillips under the License Agreement.

75.     Lilly provided Sandoz with derivatives of the Host Strains, the Expression Vectors, and other Expression Technology, including derivatives of *Pichia* strain SMD1163.

76.     On information and belief, Lilly provided Proprietary Information to Sandoz

under the Manufacturing Agreement.

77.     On information and belief, Sandoz manufactured CpB for Lilly under the Manufacturing Agreement.

78.     Sandoz was not and is not an "Affiliate" of Lilly, as defined in the License Agreement.

79.     Sandoz was not and is not a "Sublicensee" of Lilly, as defined in the License Agreement.

80.     On information and belief, Lilly did not enter into any written agreement with Sandoz purporting to extend a sublicense to Sandoz to use the *Pichia* Technology.

81.     The Manufacturing Agreement does not purport to extend a sublicense to Sandoz to use the *Pichia* Technology.

82.     Sandoz did not, in the Manufacturing Agreement, accept the terms of a sublicense of the *Pichia* Technology

83.     Rather than purporting to extend a sublicense for the *Pichia* Technology, the Manufacturing Agreement provided Lilly would "retain ownership of all information, documents and materials which Lilly" provided to Sandoz "in connection with the performance of this Agreement."

84.     Lilly did not notify RCT in writing that it had sublicensed the *Pichia* Technology to Sandoz.

85.     Lilly did not notify RCT in writing that it had transferred the *Pichia* Technology to Sandoz.

86.     Lilly did not otherwise seek RCT's consent to the transfer of the *Pichia* Technology to Sandoz.

87.     Lilly did not provide any accountings to RCT for Sandoz's operations under the Manufacturing Agreement.

88.     On or about January 1, 2007, Lilly and Sandoz extended the term of the Manufacturing Agreement.

89.     The License Agreement did not permit Lilly to enter into a manufacturing

agreement with a third party that entailed the third party's use of the *Pichia* Technology, unless the third party either was an "Affiliate" (as defined in the License Agreement) or a "Sublicensee" under Section 3.3 of the License Agreement.

90.     Lilly has extended sublicenses to use the *Pichia* Technology to unaffiliated third parties other than Sandoz and, on those occasions, Lilly informed RCT of its actions. By way of example:

> a.  In an undated letter from Lilly's patent attorney that RCT received, upon information and belief, in 2007 or 2008, Lilly notified RCT that Lilly extended a sublicense to AMBRX, Inc. under the License Agreement. Lilly represented that AMBRX was serving as a third party to make Reagent solely for Lilly; and

> b.  On several occasions between 2004 and 2006, Lilly notified RCT in writing that Lilly extended non-commercial sublicenses to academic institutions for research purposes, under the terms of the License Agreement.

### *Pichia's Role in Lilly's Manufacturing Process*

91.     Lilly manufactures a number of commercial insulin products, including Humulin® (human insulin), Humalog® (insulin lispro, an analog of human insulin), and r-glucagon (recombinant glucagon) (collectively referred herein as Lilly's "Diabetes-Care Products"). The active pharmaceutical ingredients in Lilly's Diabetes-Care Products are collectively referred to herein as the "APIs."

92.     Lilly markets and sells its Diabetes-Care Products globally.

93.     On information and belief, since at least 1997, Lilly has produced CpB expressed in *Pichia* using the *Pichia* Technology, either directly or through Sandoz.

94.     On information and belief, since at least 1997, Lilly used the *Pichia* Technology for commercial purposes including by expressing commercial volumes of CpB.

95.     Lilly does not sell CpB.

96.     On information and belief, since at least 2003, Lilly internally uses the *Pichia*-expressed CpB in the production process of the APIs for its Diabetes-Care Products.

97.     Three proteins—proinsulin (or proglucagon), trypsin and CpB—are necessary to produce the APIs.

98.     The APIs cannot be produced without CpB.

99.     CpB expressed by a *Pichia* expression system directs the production of the APIs, in combination with trypsin, by converting proinsulin (or proglucagon) into active insulin (or glucagon).

100.    The *Pichia*-expressed CpB is an essential component in Lilly's process of manufacturing the APIs.

101.    Proinsulin (or proglucagon) is not a "End Product" as this term is defined in the License Agreement.

102.    Proinsulin (or proglucagon) is not a "Bulk Product" as this term is defined in the License Agreement.

103.    Proinsulin (or proglucagon) is not sold in a final dosage form for utilization by an ultimate consumer.

104.    The CpB produced by Sandoz for Lilly under the Manufacturing Agreement is not "Product," as defined in the License Agreement, because it is not a pharmaceutical, diagnostic, or therapeutic agent sold for use by the ultimate consumer.

105.    Lilly uses insulin made with *Pichia*-expressed CpB as a component in the production of various other products.

### ***Lilly's Reporting and Royalty Obligations***

106.    Section 4.4 of the License Agreement required Lilly to pay a minimum of $30,000 per year in royalties and maintenance fees.

107.    Section 4 of the License Agreement provided formulae for calculating any additional royalties to be paid by Lilly in connection with Lilly's use of the *Pichia*

Technology.

108.    Section 5 of the License Agreement, entitled "Reports, Records and Inspection," enumerated Lilly's reporting and record-keeping obligations under the License Agreement.

109.    Section 5.1 of the License Agreement required Lilly to periodically "render to Phillips … a written statement setting forth the amount of Product sold in the particular Calendar Quarter Year, the Net Sales Price of each Product or Reagent sold, the savings resulting from the use of Reagent and the total royalties payable."

110.    Under Sections 4 and 5 of the License Agreement, Lilly's royalty payments were based, among other things, on Lilly's periodic reports of the amount of Product and Reagent used, produced, and sold.

111.    Throughout the term of the License Agreement in its periodic reports, Lilly represented to Phillips and RCT that Lilly had not used the *Pichia* Technology in a royalty-bearing way.

112.    Throughout the term of the License Agreement, Lilly paid the minimum maintenance fee of $30,000.

113.    In or about December, 2012, in a letter to RCT, Lilly's Corporate Counsel stated on Lilly's behalf that "Lilly has never sold a Product as that term is defined in the Agreement."

114.    On or about October 29, 2015, during a telephone conversation with Lilly's Assistant General Patent Counsel, Lilly disclosed to RCT that it was using the *Pichia* Technology to manufacture CpB.

115.    On or about November 25, 2015, Lilly's Assistant General Patent Counsel confirmed that fact, among others, in a letter to RCT.

116.    Before October 29, 2015, Lilly never reported to RCT that it had made royalty-bearing use of the *Pichia* Technology.

117.    Before October 29, 2015, Lilly never reported to RCT that it had used the *Pichia* Technology to produce "Reagent," as defined in the License Agreement.

118. Before October 29, 2015, Lilly never reported to RCT any sales of "Product," as defined in the License Agreement.

119. Before October 29, 2015, Lilly never reported to RCT that Lilly gave Sandoz access to the *Pichia* Technology.

120. Before October 29, 2015, RCT had no reason to know that Lilly gave Sandoz access to the *Pichia* Technology.

121. Before October 29, 2015, RCT did not know that Lilly gave Sandoz access to the *Pichia* Technology.

122. Before October 29, 2015, Lilly never reported to RCT that Lilly was using the *Pichia* Technology to manufacture Lilly's Diabetes-Care Products.

123. Before October 29, 2015, RCT had no reason to know that Lilly was using the *Pichia* Technology to manufacture Lilly's Diabetes-Care Products.

124. Before October 29, 2015, RCT did not know that Lilly was using the *Pichia* Technology to manufacture Lilly's Diabetes-Care Products.

### *RCT's Termination of the License Agreement and Lilly's Breach of its Post-Termination Obligations*

125. On or about April 4, 2016, RCT gave written notice to Lilly of its breaches of the License Agreement (the "Default Notice").

126. Under Section 10.2 of the License Agreement, if Lilly defaulted or failed to perform any of the terms, obligations, or provisions of the License Agreement, RCT had the right, at its option, to cancel and terminate the License Agreement, and all licenses granted under it, if the default was not corrected within thirty days after written notice of default.

127. Lilly failed to cure its defaults under the License Agreement within thirty days after the Default Notice.

128. On June 29, 2016, RCT gave Lilly written notice that RCT was terminating the License Agreement, effective immediately, under Section 10.3 of the License Agreement ("the Termination Notice").

-14-

129.   A complete and accurate copy of the Termination Notice is attached as Exhibit B.

130.   RCT was entitled, under the terms of the License Agreement, to terminate the License Agreement because of Lilly's uncured breaches when RCT transmitted the Termination Notice to Lilly.

131.   The License Agreement, and all licenses thereunder, terminated on or about June 29, 2016, when RCT gave Lilly the Termination Notice.

132.   Under Section 10.1 of the License Agreement, the licenses granted under Article 3 of the License Agreement would become "irrevocable and fully paid" only upon "the expiration of the last to expire of the Patent Rights" and only if the License Agreement had not already been terminated.

133.   The expiration date of the last to expire of the Patent Rights (Canadian Patent No. 1340733) was September 14, 2016.

134.   Because RCT terminated the License Agreement before September 14, 2016, the licenses granted under Article 3 of the License Agreement did not become "irrevocable and fully paid."

135.   Under Section 10.3 of the License Agreement, upon a termination of the License Agreement, Lilly was obligated to immediately cease using, and to return to RCT, "all Host Strains, Expression Vectors and Expression Systems in Licensee's or an Affiliate's or sublicensee's possession and any information relating to such."

136.   The Termination Notice demanded that Lilly immediately return to RCT all Host Strains, Expression Vectors and Expression Systems and any information relating to such material in the possession of Lilly, Sandoz, or any of Lilly's affiliates or sublicensees.

137.   Lilly failed to respond to the Termination Notice.

138.   On July 22, 2016, RCT sent Lilly another letter again demanding that Lilly comply immediately with its obligations under Section 10.3 of the License Agreement (the "July 22, 2016 Letter").

139.   A complete and accurate copy of the July 22, 2016 Letter is attached as

1    Exhibit C.

2         140.    Lilly failed to comply with the Termination Notice or with the July 22, 2016

3    Letter.

4         141.    On August 16, 2016, RCT sent Lilly yet another letter again confirming

5    RCT's termination of the License Agreement (the "August 16, 2016 Letter").

6         142.    A complete and accurate copy of the August 16, 2016 Letter is attached as

7    Exhibit D.

8         143.    Lilly failed to respond to the August 16, 2016 Letter.

9         144.    On information and belief, Lilly failed to take any action to comply with its

10   obligations under Section 10.3 of the License Agreement.

11        145.    On information and belief, Lilly, Sandoz, or Lilly's affiliates or sublicensees

12   continue to possess and use the *Pichia* Technology in the process of manufacturing Lilly's

13   APIs.

14        146.    Lilly materially breached its obligations under Section 10.3 of the License

15   Agreement.

16        147.    In both the Termination Notice and the July 22, 2016 Letter, RCT stated that,

17   to the extent Lilly was unable to identify or implement the use of an alternative source of

18   CpB, RCT would discuss with Lilly the terms under which Lilly might continue to use its

19   inventory of *Pichia*-produced CpB, such that Lilly's production of its Diabetes-Care

20   Products would not be disrupted.

21        148.    Lilly did not engage in discussion with RCT concerning Lilly's continued,

22   and now unlicensed, use of the *Pichia* Technology.

23                                    **COUNT I**
                           **BREACH OF CONTRACT –**
24                       **EXCEEDING SCOPE OF LICENSE**

25        149.    RCT incorporates by reference the statements and allegations contained in

26   the preceding paragraphs as if set forth in full.

27        150.    The License Agreement constituted a binding contract between Lilly and

28   RCT, as successor-in-interest to Phillips.

151.    To the extent the APIs are not "Products" as this term is defined in the License Agreement, CpB is not a "Reagent" as this term is defined in the License Agreement and Lilly breached its obligation not to use the *Pichia* Technology in a manner that exceeded the scope of its license.

152.    As a direct and proximate result of Lilly's breach of the License Agreement, RCT incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

153.    RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT II**
**BREACH OF CONTRACT –**
**CONFIDENTIALITY**

154.    RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

155.    Lilly breached Section 6.2 of the License Agreement by providing the *Pichia* Technology and related confidential information (including the Proprietary Information) to Sandoz, which was neither an "Affiliate" or a "Sublicensee," as defined in the License Agreement.

156.    Alternatively, if Sandoz was a "Sublicensee," Lilly breached Section 3.3 of the License Agreement.

157.    As a direct and proximate result of Lilly's breach of the License Agreement, RCT incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

158.    RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT III**
**BREACH OF CONTRACT –**
**REPORTING AND PAYMENT**

159.    RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

160.    To the extent Lilly used an Expression System to produce or direct the production of "Product," Lilly breached its reporting obligations under the License Agreement and breached the License Agreement by failing to pay royalties when due.

161.    As a direct and proximate result of Lilly's breaches of the License Agreement, RCT incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

162.    RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT IV**
**BREACH OF CONTRACT –**
**LILLY'S CONDUCT FOLLOWING**
**TERMINATION OF THE LICENSE AGREEMENT**

163.    RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

164.    After receiving the Termination Notice, Lilly's failure to immediately cease use of, and to return to RCT, all Host Strains, Expression Vectors, Expression Systems, and any information relating to such material in the possession of Lilly, its affiliates or sublicensees, or Sandoz, breached Section 10.3 of the License Agreement.

165.    As a direct and proximate result of Lilly's breach of the License Agreement, RCT has incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial.

166.    RCT is entitled to recover its reasonable attorneys' fees and costs under applicable law, including, but not limited to, A.R.S. § 12-341.01.

**COUNT V**
**CONVERSION**

167.    RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

168.    Since at least 2003, Lilly has exercised unauthorized and wrongful control over the Biological Materials and the non-tangible elements of the *Pichia* Technology.

169.     The Biological Materials are intrinsically valuable and unique, and cannot be recreated or substituted with other biological materials.

170.     Lilly knew of the proprietary nature and inherent value of the Biological Materials, and in particular the Host Strain including the SMD1163 strain, the vectors and plasmids, and the non-tangible elements of the *Pichia* Technology.

171.     Lilly has knowingly or intentionally exerted unauthorized control over the Biological Materials and the non-tangible elements of the *Pichia* Technology.

172.     Lilly continues to exert unauthorized control over the Biological Materials and the non-tangible elements of the *Pichia* Technology.

173.     Lilly's conversion damaged and continues to damage RCT in an amount to be proven at trial.

**COUNT VI**
**UNJUST ENRICHMENT**

174.     RCT incorporates by reference the statements and allegations contained in the preceding paragraphs as if set forth in full.

175.     In addition, or in the alternative to RCT's contract-based claims, and without waiving the foregoing, RCT alleges a claim for Lilly's unjust enrichment.

176.     Since at least 2003, Lilly has enriched itself and others by the unauthorized and wrongful control over the Biological Materials and by the unauthorized use of the *Pichia* Technology without RCT's permission.

177.     Lilly acted without RCT's knowledge or consent and knew its actions were not authorized.

178.     At all times, there was no justification for Lilly's unjust enrichment and RCT has been unjustly impoverished by Lilly's retaining money and other benefits without payment or compensation to RCT.  As a direct result of its actions, Lilly has been unjustly enriched at the expense of RCT.

179.     As a direct result of Lilly's actions, RCT has suffered and continues to suffer harm, in that it provided the Biological Materials and the *Pichia* Technology to Lilly, but

1    was not compensated for the benefit it conferred.

2        180.    In the absence of a legal remedy, Lilly should be required to account for all

3    monies, profits, and gains and other benefits which it has unjustly obtained at Lilly's

4    expense and impoverishment and a constructive trust should be imposed thereon for the

5    benefit of RCT.

6        **WHEREFORE**, RCT respectfully requests that the Court enter judgment against

7    Lilly in RCT's favor, as follows:

8                    A.    Awarding RCT compensatory damages in an amount to be proven at

9                          trial;

10                   B.    Awarding RCT exemplary damages in an amount to be proven at trial;

11                   C.    Imposing a constructive trust upon Lilly's unjustly gained profits for

12                         the benefit of RCT;

13                   D.    Ordering Lilly to comply with its post-termination obligations under

14                         the License Agreement;

15                   E.    Awarding RCT its costs under Ariz. Rev. Stat. §§ 12-341 and Ind.

16                         Code § 34-52-1-1; and

17                   F.    Awarding RCT its reasonable attorney's fees under A.R.S. §§ 12-

18                         341.01; and

19                   G.    All such other relief the Court deems just and proper.

20   /./.

21   /./.

22   /./.

23   /./.

24   /./.

25   /./.

26   /./.

27   /./.

28   /./.

Respectfully submitted this 9th day of October, 2018.

**RUSING LOPEZ & LIZARDI, P.L.L.C.**

/s/ Sivan R. Korn
Michael J. Rusing
Sivan R. Korn
Isaac S. Crum
Sarah S. Letzkus

**PEARL COHEN ZEDEK LATZER BARATZ LLP**

/s/ Veronica M. Munoz
Veronica M. Munoz
*Attorneys for Plaintiff*

-21-

1

2

### CERTIFICATE OF SERVICE

3

I hereby certify that on the 9th day of October, 2018, a copy of the foregoing has been filed with the Clerk of the court and a copy transmitted to the following parties via U.S. Mail.

4

5   Jeffrey Willis, Esq.
    Jacob Jones, Esq.

6   SNELL & WILMER L.L.P.
    One South Church Ave, Ste 1500

7   Tucson, AZ 85701

8

9   David J.F. Gross (pro hac vice)
    FAEGRE BAKER DANIELS LLP

10  1950 University Avenue, Suite 450
    East Palo Alto CA 94303

11  david.gross@faegrebd.com

12  Timothy E. Grimsrud (pro hac vice)

13  Julie B. Wahlstrand (pro hac vice)
    Katherine S. Razavi (pro hac vice)

14  FAEGRE BAKER DANIELS LLP

15  2200 Wells Fargo Center
    90 S. Seventh St.

16  Minneapolis, MN 55402
    tim.grimsrud@faegrebd.com

17  julie.wahlstrand@faegrebd.com

18  kate.razavi@faegrebd.com

19  Amy E. Hamilton (pro hac vice)
    Andrew M. McCoy (pro hac vice)

20  FAEGRE BAKER DANIELS LLP

21  300 N. Meridian St., Suite 2700
    Indianapolis, IN 46204

22  amy.hamilton@faegrebd.com
    andrew.mccov@faegrebd.com

23

24

    By:  /s/ Natalie Tucker

25

26

27

28

-22-