**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Research Corporation Technologies Incorporated,<br><br>                    Plaintiff,<br><br>v.<br><br>Eli Lilly and Company,<br><br>                    Defendant. | No. CV-16-00191-TUC-SHR<br><br>**Order Granting In-Part and Denying In-Part Summary Judgment** |

Pending before the Court are Defendant Eli Lilly and Company ("Lilly")'s Motion for Summary Judgment (Doc. 236) and Plaintiff Research Corporation Technologies, Inc. ("RCT")'s Motion for Partial Summary Judgment (Docs. 238[1], 248).  This action arises from a contract dispute and Lilly's alleged use of RCT's technology to produce Lilly's diabetes medications.

## I.    BACKGROUND

In 1990, Lilly entered into a License Agreement (the "Agreement") (Doc. 39-1) with Phillips Petroleum Company ("Phillips") in which Phillips licensed Lilly to use certain yeast expression technology for research and commercial purposes. Phillips agreed to provide Lilly certain strains of yeast called *Pichia pastoris* ("*Pichia*"), certain expression vectors, a procedures manual and other information related to the expression technology

---

[1] Doc. 238 is a redacted version of RCT's motion for summary judgment; Doc. 248 is the sealed version.  Because the Court granted the parties' motions to seal their motions for summary judgment (Docs. 235, 245, 246), this Order will refer only to the sealed motions.

for Lilly to use to produce "Product" or "Reagent."  (*Id.*)  In exchange, Lilly agreed to pay Phillips royalties of two percent (2%) of the net sales value derived from the sale of End Product or Reagent.  (*Id.*)  The Agreement defines the following terms:

- "Host Strain" means "the primary strain of *Pichia pastoris* which has been used by Phillips and the Salk Institute Biotechnology/Industrial Associates, Inc. ("SIBIA") to produce various materials.  This strain is identified by Phillips as GTS115.  Host Strain shall also mean any strains of *Pichia pastoris* derived in any manner from the strain provided to [Lilly] by Phillips or derived using information provided to [Lilly] by Phillips directly or indirectly under this Agreement."  ¶ 1.1.

- "Expression Vector" means "the vectors described in Attachment A. Expression Vector shall also include vectors derived in any manner from the Expression Vectors provided to [Lilly] under this Agreement or derived using information provided to [Lilly] by Phillips directly or indirectly under this Agreement."  ¶ 1.2.

- "Expression System" means "the Host Strain containing an Expression Vector which directs the production of a Product or Reagent."  ¶ 1.3.

- "Expression Technology" means "Phillips technology and materials useful in the production of Product or Reagent."  ¶ 1.9.

- "Product" means "End Product or Bulk Product."[2]  ¶ 1.7.

- "End Product" means "a human pharmaceutical or diagnostic or animal therapeutic or diagnostic, other than the human pharmaceutical or diagnostic or animal therapeutic or diagnostics listed in Attachment B, which is produced by an Expression System and which is sold in a final dosage form for utilization by an Ultimate Consumer and is not intended or marketed for further formulation, processing or chemical transformation."  ¶ 1.5.

---

[2] "Bulk Product" is not at issue and is not relevant to this matter.

- "Ultimate Consumer" means "that person or entity whose use of the product results in its destruction or loss of activity and/or loss of value." ¶ 1.4.

- "Reagent" means "a material produced using the Expression Technology and which is used in the manufacture or development of Product or which is used for research purposes." ¶ 1.8.

- "Net Sales Value" means "the proceeds actually derived from the sale of End Product, Reagent, or Bulk Product by [Lilly] or an Affiliate of [Lilly] to any third parties in the [world] less eight percent (8%) of said proceeds." ¶ 1.11.

The Agreement is governed by and construed according to Indiana Law.[3]  ¶ 13.

The following facts are undisputed:

After entering the Agreement, Phillips transferred to Lilly certain strains of *Pichia*, including SMD1163—a Host Strain,[4] certain Expression Vectors, and information related to such Host Strain and Expression Vectors.  (DSOF ¶ 1, Exh. 6 ¶¶ 84–85; PSOF ¶¶ 43–45.)[5]  In 1993, Phillips sold RCT the *Pichia* technology, the patent rights, the proprietary information, and all related intellectual property rights.  (PSOF ¶¶ 16–18, Exh. 8.)

In the early 1990s, Lilly used SMD1163 and four of the Expression Vectors it received from Phillips to develop a *Pichia* Expression System called SMD1163/pLGD43.[6]

_____

[3]Although the parties' Joint Case Management Plan submitted pursuant to Federal Rule of Civil Procedure 26(f) (Doc. 178) indicates disagreement as to whether Arizona or Indiana law applies, the parties agree in their summary judgment briefing that the choice-of-law provision in the Agreement is valid and, therefore, Indiana law governs their contract disputes.  (Doc. 236 at 11; Doc. 248 at 9–10.)  Therefore, the Court's analysis is based on Indiana law.  *See House v. Internal Revenue Serv.*, CV-07-00768-PHX-SRB, 2008 WL 11448019, at *5 (D. Ariz. Mar. 14, 2008) (when choice-of-law provision is valid and enforceable, "Arizona courts will apply the law of the state chosen by the parties to govern their contractual relationship" (quoting *Winsor v. Glasswerks PHX, L.L.C.*, 63 P.3d 1040, 1043 (Ariz. Ct. App. 2003))); *see also Wojtysiak v. State Farm Mut. Auto. Ins. Co.*, CV-18-00148-PHX-DLR, 2019 WL 4081895, at *4 (D. Ariz. Aug. 29, 2019) (applying Illinois law per valid and enforceable choice-of-law contract clause).
[4]Lilly derived SMD1163 from various *Pichia* DNA fragments from the Host Strains Phillips provided under the Agreement.
[5]DSOF and PSOF are Defendant's and Plaintiff's statements of facts filed in support of their respective motions.  DSOF is docketed at item 237 in the electronic record; PSOF is docketed at item 247.
[6]Lilly developed pLDG43, which is an Expression Vector, by using, in part, four

(DSOF ¶ 3, Exh. 6 ¶ 121; PSOF ¶ 8, Exh. 5 ¶¶ 133–35.)  SMD1163/pLGD43 expresses only one thing:  an enzyme (which is a type of protein) called Carboxypeptidase-B ("CpB").  (DSOF ¶¶ 3, 8, Exh. 3 ¶ 257, Exh. 6 ¶ 121; Doc. 308 (Oral Argument Transcript) at 47–48, 59.)  CpB is not a human pharmaceutical or End Product and Lilly does not sell CpB.  (Doc. 236 at 6; Doc. 264 at 8; Doc. 151 at 23; Doc. 308 at 66–67.)

Lilly uses a separate *E. coli* expression system to express a protein called proinsulin.  (DSOF ¶ 13, Exhs. 4–5; PSOF ¶ 97, Exhs. 56, 68.)   Proinsulin is not a human pharmaceutical or End Product under the Agreement because it must undergo further processing to become a human pharmaceutical.  (Doc. 267 at 12; Doc. 236 at 8–10; DSOF Exh. 5 ¶ 83, Exh. 4 ¶¶ 124, 126–27, 201, 261; PSOF Exh. 68; Doc. 308 at 12, 47, 62.)

Neither SMD1163/pLGD43 nor the *E. coli* expression system alone can produce the active pharmaceutical ingredient ("API") in the Diabetes Drugs at issue.[7]  (DSOF Exh. 5 ¶¶ 77, 83; PSOF ¶¶ 103–12.)  Rather, Lilly uses the proinsulin expressed by the *E. coli* expression system and the CpB[8] expressed by SMD1163/pLGD43, along with many other materials, to produce insulin.  (Doc. 308 at 53–54, 63–64.)  Essentially, CpB acts as scissors to cleave certain amino acids from the proinsulin protein, which, in combination with other chemical processes, ultimately yields insulin.  (DSOF Exh. 5, ¶ 85; PSOF ¶¶ 103–08; Doc. 308 at 60.)  That is, without CpB, proinsulin cannot become active and operate as a human pharmaceutical.  (PSOF Exh. 69 ¶¶ 109–11, 117; DSOF Exh. 9.)  The insulin created by using proinsulin and CpB is the API of the Diabetes Drugs, which Lilly markets and sells in final dosage form to an Ultimate Consumer.  (PSOF ¶¶ 105–12; Doc. 151 at 23; Doc. 236 at 8 n.8; DSOF Exh. 4 ¶¶ 124, 126–27, 201, 261.)

In 2001, Lilly extended a sublicense to and entered into a manufacturing agreement

---

Expression Vectors it had received from Phillips.  (DSOF ¶ 2, Exh. 6 ¶ 103.)

[7] The API in Humulin is insulin, whereas the APIs in Humalog and glucagon are insulin lispro and glucagon, respectively.  (DSOF Exh. 4 ¶ 201.)  Although insulin lispro and glucagon are different from insulin, they are produced in a similar fashion as insulin.  (DSOF Exh. 4 ¶ 201.)  The Court assumes this is why the parties' briefing focuses almost exclusively on insulin; for simplicity, this Order will do the same.

[8] Before the Agreement, Lilly used animal-sourced CpB.  (Doc. 178 at 4.)

with an Austrian company, Sandoz GmbH ("Sandoz"),[9] under which Sandoz used SMD1163/pLGD43 to produce CpB, which Lilly then used in the process described above to manufacture the Diabetes Drugs.  (Doc. 151 at 18–20; Doc. 178 at 4; DSOF Exh. 9.) Lilly did not provide written notice to RCT of the manufacturing agreement until October 2015.  (Doc. 151 at 21.)

In November 2015, Lilly sent RCT a letter explaining it had been purchasing *Pichia*-made CpB from Sandoz and using that CpB to "trim off amino acids" from "an intermediate protein" in the "production of each API" of the Diabetes Drugs.  (DSOF Exh. 9.)

In April 2016, RCT brought this action against Lilly.  (Doc. 6.)  In its Fourth Amended Complaint ("Complaint") (Doc. 149), RCT alleges the following:

  I. Breach of Contract – Exceeding the Scope of License;
  II. Breach of Contract – Confidentiality / Failure to Notify RCT of Sublicense;
  III. Breach of Contract – Failure to Report Sales and Pay Royalties;
  IV. Breach of Contract – Failure to Cease Using and Returning Materials and Information to RCT After RCT Terminated Agreement;
  V. Conversion; and
  VI. Unjust Enrichment.

Lilly has moved for summary judgment on all counts and RCT has moved for partial summary judgment on Counts II and III.  RCT has also asked the Court to find the Agreement would have naturally expired on September 14, 2016 and to "summarily dismiss" Lilly's mutual mistake and statute of limitations defenses, as well as Lilly's argument that royalties should be calculated as 2% of the amount Lilly pays its contractor for the production of CpB.  (Doc. 248 at 2–4 (citing Doc. 149 at 24–36).)  The parties have thoroughly briefed the issues.  On August 5, 2021, the Court held oral argument on the motions. (Docs. 305, 308.)  For the reasons that follow, the Court grants in-part and denies in-part both motions.

---

[9]Lilly entered the manufacturing agreement with BioChemie GmbH, which is a subsidiary of Sandoz.  (Doc. 151 at 19.)

## II.     SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, upon a party's motion, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.     DISCUSSION

At oral argument, the parties agreed there are no genuine disputes of material fact and the Court may resolve these motions on summary judgment.  (Doc. 308 at 23–24, 36, 46–50, 68, 70, 80, 94.)  The Court agrees and finds summary judgment is appropriate on some issues raised by the parties.  For the reasons that follow, the Court concludes Count III is dispositive and determinative of other counts; therefore, this Order begins with Count III.

### A.  Count III – Failure to Report Sales and Pay Royalties

RCT alleges Lilly "used an Expression System to produce or direct the production of '[End] Product'" when it used SMD1163/pLGD43 in the production of Lilly's Diabetes Drugs, breached its reporting obligation, and failed to pay royalties on the Net Sales Value of the Diabetes Drugs.  (Doc. 149 at 18, ¶ 160.)  Lilly argues it is entitled to judgment on this count because the Diabetes Drugs are not "[End] Product" under the Agreement because "under the Agreement, '[End] Product' must be expressed by a *Pichia* Expression System" and "it is undisputed" the Diabetes Drugs "are not expressed by a *Pichia* expression system," and SMD1163/pLGD43 expresses CpB—not insulin.  (Doc. 236 at 12–16.)  In summary, Lilly argues that under the plain language of the Agreement: "'*produced by* an Expression System' means '*expressed by* a *Pichia* Expression System.'" (Doc. 298 at 1 (emphasis added).)  Further, Lilly asserts these facts are undisputed because RCT's president previously confirmed the Diabetes Drugs "are synthesized in *E. coli*" and are "not produced by a *Pichia* expression system," and, therefore, are not End Product under the Agreement.  (*Id.* at 16.)

RCT argues it is entitled to judgment because the undisputed facts show it meets all three elements to recover for breach of contract under Indiana law. "It is well settled that '[t]o recover for a breach of contract, a plaintiff must prove: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach.'" *Morris v. Crain*, 71 N.E.3d 871, 880 n.5 (Ind. Ct. App. 2017) (quoting *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007)); *see also Hess v. Biomet, Inc.*, 2017 WL 661511, at *3 (N.D. Ind. Feb. 16, 2017). The parties agree the Agreement is a valid contract and Lilly does not dispute that if it breached the Agreement's reporting and royalty payment provisions, RCT suffered damages from Lilly's breach. Therefore, the following analysis focuses on the second element—whether Lilly breached the Agreement by failing to report the sale of End Product and failing to pay royalties on said End Product.

First, to determine whether Lilly breached the Agreement as RCT alleges, the Court must consider whether the undisputed material facts show Lilly used an Expression System to produce End Product. This question, in turn, requires the Court to determine whether Lilly's Diabetes Drugs constitute "End Product" under the Agreement. Lilly argues the Diabetes Drugs are not End Product because, "under the Agreement, '[End] Product' must be expressed by a *Pichia* Expression System" and the only thing SMD1163/pLGD43 expresses is CpB. (Doc. 236 at 12.) In other words, Lilly argues the phrase "produced by" as it appears in the definition of End Product "unambiguously means *expressed by* a *Pichia* expression system." (*Id.* (emphasis added); Doc. 289 at 4; Doc. 298 at 1.) Lilly further asserts that because SMD1163/pLGD43 indisputably does not express the APIs in the Diabetes Drugs, the Diabetes Drugs are not "produced by" a *Pichia* Expression System.[10] (*Id.* at 14–16; Doc. 264 at 5; Doc. 298 at 7.)

---

[10]Lilly also contends RCT's "prior admissions" from previous complaints and potential settlement communications "confirm that Lilly's Diabetes Drugs are not produced by *Pichia* and thus are not '[End] Product' under the Agreement." (Doc. 236 at 16; Doc. 264 at 5–7; Doc. 298 at 7.) However, such extrinsic documents are not relevant to the facts material to whether "produced by" means "expressed by." Further, an amended pleading supersedes prior pleadings and, therefore, the prior pleadings are "treated thereafter as non-existent." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992).

RCT argues "'expressed' is not a synonym for 'produced,'" because an End Product is not "expressed," as expression in the biological sciences refers to the "transcription of a specific gene and synthesis of the encoded protein within a cell." (Doc. 267 at 8–10.) In other words, according to RCT, because an expression system only expresses a protein, which requires further chemical processing to become an API and ultimately a pharmaceutical in final dosage form for use by an Ultimate Consumer, the parties deliberately used the terms "express" and "produce" in different contexts. (*Id.* at 8–11.) RCT further asserts the Diabetes Drugs are produced by a *Pichia* Expression System because Lilly uses SMD1163/pLGD43 to produce the CpB that it uses in the production of the Diabetes Drugs. (*Id.* at 11–13.) That is, RCT argues "produced by" is a broad term, which encompasses the larger manufacturing process and is not limited to the expression of a single protein. (*Id.*) The Court agrees.

"Generally, construction of the terms of a written contract is a question of law." *Collins*, 871 N.E.2d at 372; *see also McKeighen v. Daviess Cnty. Fair Bd.*, 918 N.E.2d 717, 720 (Ind. Ct. App. 2009) ("The construction of a contract and an action for its breach are matters of judicial determination."). "The ultimate goal of any contract interpretation is to determine the intent of the parties when they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). To do so, the Court begins "with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id.*; *see also Metro Holdings One, LLC v. Flynn Creek Partner, LLC*, 25 N.E.3d 141, 157 (Ind. Ct. App. 2014) ("A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." (quoting *Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 846 (Ind. Ct. App. 2013))). And, "[w]here the terms of a contract are clear and unambiguous, [the Court] will not construe the contract or look at extrinsic evidence, but will apply the contractual provisions." *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1129 (Ind. Ct. App. 2011) (internal citation omitted); *see also City of Jeffersonville v. Envt'l. Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011) (interpretation of contract controlled by intent of

parties as expressed by clear language of contract).

The Court finds, and the parties do not dispute, the language of the Agreement is unambiguous.  Rather, they disagree as to the meaning of "produced by."  "However, a contract term is not ambiguous merely because the parties disagree about the term's meaning."  *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016). Therefore, the Court may not look to extrinsic evidence to vary or explain the Agreement, but must determine the parties' intent from the four corners of the Agreement.  *See Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006) (Indiana follows "the four corners rule," so extrinsic evidence not admissible to add to, vary, or explain terms of contract where terms are clear and unambiguous); *see also Murat Temple Ass'n*, 953 N.E.2d at 1129; *Jeffersonville*, 954 N.E.2d at 1008.

As explained above, the undisputed facts show Lilly used parts of four Expression Vectors it received from Phillips under the Agreement to make a new vector, pLGD43. Therefore, pLGD43 is an Expression Vector as defined by the Agreement.  *See* Agreement ¶ 1.2 ("Expression Vector shall also include vectors derived in any manner from the Expression Vectors provided to [Lilly] under this Agreement or derived using information provided to [Lilly] by Phillips directly or indirectly under this Agreement.").  Lilly used that Expression Vector and SMD1163—a Host Strain under the Agreement—to create a new expression system called SMD1163/pLGD43.  Therefore, SMD1163/pLGD43 is an Expression System as defined by the Agreement.  *See* Agreement ¶ 1.3 ("Expression System" means "the Host Strain containing an Expression Vector which directs the production of a Product or Reagent.").  It is also undisputed SMD1163/pLGD43 expresses only one thing: CpB.  While Lilly emphasizes this point and the fact that a separate non-Phillips/RCT *E. coli* expression system is what expresses proinsulin, the Court finds it important to note that, like CpB, proinsulin is not an API, and proinsulin requires further chemical processing to become an End Product.  Because it is undisputed neither of these expression systems express End Product, but rather express proteins that require further processing or chemical transformation, the Court concludes "produced by" cannot be synonymous with "expressed by."  To adopt Lilly's interpretation would render the royalty

terms and definitions of "End Product" and "Reagent" ineffective and meaningless because if "produced by" means "expressed by," then the only circumstances under which Lilly would owe royalties would be when it uses a *Pichia* Expression System to express an End Product or a Reagent used for research purposes. *See Metro Holdings*, 25 N.E.3d at 157 (courts should construe language of contract so as not to render any words, phrases, or terms ineffective or meaningless). Under Lilly's definition, where "produced by" means "expressed by," an End Product could never be made under the Agreement, because, as set forth above, expression systems produce proteins—not APIs. *See* Agreement ¶ 1.5. As such, under Lilly's definition, much of the contract would be rendered superfluous. Although Lilly asserted at oral argument that "expression systems express, and you can express a[n] [End] Product" (Doc. 308 at 60, 65), counsel did not explain or answer what kind of End Product could be produced by a *Pichia* Expression System alone that would not require further formulation, processing or chemical transformation.

Lilly's suggestion the *Pichia*-made CpB is a Reagent because it is produced by a *Pichia* Expression System and then "later used in the manufacture of a Product," (Doc. 308 at 65, 70–71, 73) also undercuts its argument that "produced by" means "express by." Reagent is defined as "a material used in the manufacture or development of Product or which is used for research purposes."[11]  Agreement ¶ 1.8. Therefore, CpB can only be a Reagent if the Diabetes Drugs are, as relevant here, End Product. When asked about this at oral argument, defense counsel explained:  "we say that the 'capital P' Product—that you would not interpret 'capital P' Product as 'capital P.'  We think the parties, in their negotiations treated 'capital P' Product as 'lower p,' that made it broader."  (Doc. 308 at 72.)  However, as explained above, when the contract language is unambiguous, as it is here, the Court does not look to extrinsic evidence to vary or explain the contract, but rather determines the parties' intent from only the four corners of the Agreement. *See Univ. of S. Ind. Found.*, 843 N.E.2d at 532; *Broadbent*, 59 N.E.3d at 311.  The parties here unambiguously used "capital P" Product.  Therefore, where "Product" is used, the Court

---

[11]The parties do not suggest Lilly used the CpB for research purposes; accordingly, the research portion of the definition of "Reagent" is irrelevant to this discussion.

must conclude the parties intended it to mean, as applicable here, End Product.  And, because the definition of Reagent requires it to be used in the manufacture or development of End Product in this case, CpB can only be Reagent if the Diabetes Drugs are End Product.  Therefore, Lilly's argument that CpB is a Reagent but the Diabetes Drugs are not End Product cannot stand.  Put another way, if "produced by" means "expressed by," then the Diabetes Drugs cannot be End Product, which, in turn, means CpB cannot be a Reagent by definition because it is used in the manufacture and development of something that, under Lilly's interpretation, would not be End Product.

Further, if a *Pichia* Expression System could express an End Product, then there would be no need to define the term Reagent as "a material used in the manufacture or development of Product," as no further processing would be necessary, thus rendering that portion of the Reagent's definition meaningless.  *See Metro Holdings*, 25 N.E.3d at 157.

Moreover, the other terms of the Agreement support interpreting "produced by" to mean just what it says.  First, the Agreement defines "Expression Technology" as "Phillips technology and materials *useful in the production of Product* or Reagent"—it does not say "useful in the *expression* of Product or Reagent."  *See* Agreement ¶ 1.9 (emphasis added).  Second, "Expression System" is defined as "the Host Strain containing an Expression Vector *which directs the production of a Product* or Reagent."  *Id.* ¶ 1.3 (emphasis added).  Third, "Reagent" is defined as "a material produced using the Expression Technology and which is *used in the manufacture or development of Product* or which is used for research purposes."  *Id.* ¶ 1.8 (emphasis added).

Beyond the definitions, the Agreement also repeatedly uses the term "produce," *see id.* ¶¶ 2.2, 3.1, whereas "express" only appears once outside of its use as part of a defined term.  The recitals portion of the Agreement states:

> Whereas, Phillips has developed a recombinant yeast expression system and has the right to grant a license to use such yeast expression system;
>
> Whereas, [Lilly] is interested in evaluating the expression of various products in such yeast expression system and is interested in obtaining a license to produce products . . . .

- 11 -

This section demonstrates the parties understood a difference between the terms "express" and "produce," as "expression" is used here strictly in the context of "evaluating the expression of various products in a yeast expression system," whereas the second recital employs the word "produce" in the context of making "products."

The definitions, together with the entire Agreement, evince the parties' intent to include the use of the Expression Technology in the production, manufacture, and development of End Product—not merely the expression of a single protein. Therefore, the Court concludes "produced by" does not mean "expressed by," but is broader and refers to the production process—not merely the expression of a protein.

Because it is undisputed the Expression Technology was used to produce CpB, which was then used in the production process of Lilly's Diabetes Drugs, the Court finds Lilly's Diabetes Drugs are End Product under the Agreement. *See* Agreement ¶ 1.5. And, because it is undisputed Lilly failed to fulfill its reporting obligations and failed to pay royalties for the Diabetes Drugs, the Court concludes RCT has satisfied the second element of its contract claim.

As to the third element of damages, RCT alleges it has "incurred and continues to incur substantial losses, costs, and damages in an amount to be proven at trial" as the direct and proximate cause of Lilly's breach. (Doc. 131 ¶ 161.) Paragraph 4.2.1 of the Agreement requires Lilly to pay RCT "a royalty of two percent (2%) of the Net Sales Value for End Product or Reagent sold by [Lilly]." Under Indiana law, a defendant moving for summary judgment "must establish a prima facie case negating at least one of the dispositive elements of Plaintiffs' claims." *Morris*, 71 N.E.3d at 880 (citing *Schmidt v. Ind. Ins. Co.*, 45 N.E.3d 781, 788 (Ind. 2015)). "Merely alleging" a plaintiff has not produced evidence of damages is insufficient to entitle a defendant to summary judgment under Indiana law. *Id.* As noted, Lilly does not attempt to negate the damages element of RCT's claim beyond merely alleging RCT has not produced evidence of damages. Therefore, RCT has demonstrated it is entitled to judgment as a matter of law on Count III, with the amount of damages to be determined at trial.

. . . .

### B.     Count I – Exceeding the Scope of the License

At oral argument, RCT confirmed Count I was only pleaded in the alternative in case the Court found the Diabetes Drugs were not "[End] Product" as defined by the Agreement.  (Doc. 308 at 26.)  Given the Court's resolution of Count III, the Court need not address this count further and will enter summary judgment in favor of Lilly only to the extent the Court concludes RCT cannot prevail on this claim because the Diabetes Drugs are End Product and, therefore, fall within the scope of the Agreement.

### C.     Count II – Confidentiality/Failure to Notify RCT of Sublicense

As to Count II, RCT alleges Lilly provided proprietary information to Sandoz— who RCT believed was not a sublicensee when filing its Complaint—in breach of the Agreement's confidentiality provisions.  RCT also argues in the alternative that if Sandoz was a sublicensee, then Lilly breached its obligation under ¶ 3.3 to promptly notify RCT of the sublicense.  (Doc. 131 ¶¶ 154–58.)  Paragraph 3.3 provides:

> Licensee shall have the right to extend a sublicense to a third party, to use Patent Rights and Expression Technology to make Product or Reagent solely for Licensee or its Affiliate to which a license has been extended under Paragraph 3.2, provided, however, that Licensee shall have such right to extend licenses only at such times as it is not in material default with respect to any of its obligations to Phillips under this Agreement. . . . Licensee shall notify Phillips promptly in writing of any such extension.

At this stage, it is undisputed Sandoz was a sublicensee.  (Doc. 308 at 37, 82; PSOF ¶¶ 151–52, 156, Exhs. 100–101; Doc. 178 at 32.)  Therefore, RCT's claim for breach of confidentiality cannot be sustained and Lilly is entitled to judgment as a matter of law on the confidentiality theory.  However, RCT's claim for breach of the sublicense notification provision in ¶ 3.3 remains.  Both parties have moved for summary judgment on this count.  Again, it is undisputed the Agreement is a valid contract, so the first element for breach of contract is satisfied.  *See Morris*, 71 N.E.3d at 880 n.5.  Therefore, the Court focuses on whether Lilly has breached ¶ 3.3 and, if so, whether RCT has suffered damages as a result. *See id.*

RCT asserts Lilly extended a sublicense to Sandoz in 2001 but did not notify RCT until 2015.  (Doc. 248 at 22.)  Lilly does not dispute this.  (Doc. 264 at 11–15.)  Thus, Lilly has breached ¶ 3.3.   As to damages, RCT argues it was injured because if Lilly had promptly notified it of the sublicense to Sandoz, RCT "would have known of Lilly's use of SMD1163/pLGD43 in a timely manner" and that information "would have triggered a discussion about the royalties owed to RCT."  (Doc. 248 at 22.)   RCT further asserts it suffered damages because it is now forced to litigate these claims, including Lilly's statute of limitations defense, as a result of Lilly's 15-year failure to notify.   (Id.)   In response, Lilly contends RCT has failed to meet its initial burden of showing there is no genuine dispute of material fact as to the existence of damages or causation because RCT has failed to present any evidence as to the existence of damages.  (Doc. 264 at 12–13.)  Lilly also argues RCT's assertion that the "amount of damages will be proven at trial" is insufficient because Indiana courts have found a defendant is entitled to summary judgment when a plaintiff "cannot establish damages with sufficient certainty to avoid speculation or conjecture by the jury."  (Id. (quoting *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 784 (7th Cir. 2006).)  Lilly also asserts RCT cannot show causation because:  (1) RCT's argument that receiving earlier notice of the sublicense "would have triggered a discussion about the royalties owed to RCT" is "pure attorney argument, not evidence"; (2) RCT has not alleged royalties are due from the "alleged technical breach" of ¶ 3.3; and (3) a reasonable jury could find a timely notice would not have triggered any response by RCT. (Doc. 264 at 13–14.)  In response, RCT counters it is seeking partial summary judgment under Rule 56(g) as to liability only and, therefore, "damages (i.e., causation and the damages amount) would be proven at trial and alleges its damages include "detrimental patent maintenance decisions and loss of critical evidence."  (Doc. 296 at 6.)

As explained above, under Indiana law, a defendant moving for summary judgment "must establish a prima facie case negating at least one of the dispositive elements of Plaintiffs' claims," and "[m]erely alleging" a plaintiff has not produced evidence of damages is insufficient to entitle a defendant to summary judgment.  *Morris*, 71 N.E.3d at 880.  The Indiana Court of Appeals has explained that although federal practice allows a

moving party to "merely show that the party carrying the burden of proof lacks evidence on a necessary element," Indiana "impose[s] a more onerous burden—to affirmatively negate an opponent's claim." *Id.* at 879.  Therefore, the Court's task is not to determine whether RCT has proven it has suffered damages, but whether Lilly has adequately met its initial burden of proving RCT has not suffered damages.  *See id.* at 881.  Lilly has provided no evidence to show RCT has not suffered damages and therefore has not adequately negated the third element of RCT's claim.  *See id.* at 880–81.

Under Rule 56(g),"[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Because the undisputed facts show Lilly breached ¶ 3.3 by failing to promptly notify RCT of the sublicense extended to Sandoz and RCT seeks to prove the damages element of its claim at trial, the Court grants partial summary judgment in favor of RCT only to the extent the Court finds Lilly breached ¶ 3.3.  Accordingly, liability as to Lilly's breach of ¶ 3.3 is not genuinely in dispute and shall be treated as an established fact in this case.  *See* Fed. R. Civ. P. 56(g).  The element of damages, however, is not yet established and shall be determined at trial.

### D.    Count IV – Lilly's Conduct Following Termination of Agreement

RCT claims Lilly breached ¶ 10.3 by failing to immediately return all Host Strains, Expression Vectors, Expression Systems, and any information relating to such material in Lilly's and Sandoz's possession after receiving RCT's termination notice.  (Doc. 131 ¶¶ 163–66.)   Paragraph 10.3 of the Agreement provides, in relevant part:   "If this Agreement is terminated under the provisions of Paragraph 4.4, Paragraph 10.2 or Paragraph 10.4, Licensee agrees to immediately return all Host Strains, Expression Vectors and Expression Systems in Licensee's or Affiliate's or sublicensee's possession, and any information relating to such, to Phillips."  And, ¶ 10.2 provides:

> In the event of the default or failure by any party to perform any of the terms, covenants or provisions of this Agreement to be done and performed by such party, such party shall have thirty (30) days after the giving of written notice of such

default within which to correct such default.  If such default is not corrected within the said thirty (30) day period after notice as aforesaid, the other parties shall have the right, at their option, to cancel and terminate this entire Agreement and the licenses granted hereunder including the licenses extended to Affiliates.

On April 4, 2016, RCT's president, Shaun Kirkpatrick, sent Lilly a letter (the "Kirkpatrick Letter") indicating it wished to negotiate a resolution to Lilly's unreported use of the *Pichia* technology and failure to pay royalties.[12]  (DSOF Exh. 10; PCSOF[13] at 109–110.)  That letter states, in relevant part:

> RCT appreciates Lilly's recent, but late, acknowledgement regarding its use of *Pichia* and its failure to report on those uses.
> . . . .
> Had Lilly timely reported its internal use, the parties would have had an opportunity to negotiate a license that would have been based on the sales of a final product.
> . . . .
> [W]e are willing to continue the discussion and resolve the matter through direct negotiations.  If that should not be possible in the near term, say within the next 45 days, we would invite Lilly to consider joining us to retain the services of a mediator.  If mediation is not successful within 90 days from the date of this letter, then the unfortunate reality is that the matter would have to be resolved through litigation.
>
> Recognizing that possibility, we have undertaken to file a complaint in the U.S. District Court for the District of Arizona, and enclose[d] a copy of that complaint.  With the anticipation that direct negotiations or mediation will enable the parties to come to an agreement on the matter, we have not yet effected services of process of the complaint.

---

[12]The admissibility of the Kirkpatrick Letter has not been raised at summary judgment and, therefore, is not properly before the Court at this stage.  Nonetheless, Lilly contends RCT has waived any objections to the admissibility of the letter by relying on the letter as a business communication.  (Doc. 298 at 17 n.12.)  For the purposes of summary judgment, the Court will consider the letter as a business record.  *See* Fed. R. Evid. 803(6)(B).

[13]Plaintiff's Controverting Statement of Facts in Opposition to Defendant's Motion for Summary Judgment, docketed at item 268 in the electronic record.

It is undisputed Lilly did not respond to the Kirkpatrick Letter.  (PCSOF ¶ 111, Exh. 158; Docs. 236, 298.)  In a June 29, 2016 letter, RCT notified Lilly it had elected to terminate the Agreement immediately pursuant to ¶ 10.2.  (PSOF Exh. 111.)

Lilly argues it is entitled to summary judgment because:   "(1) there was no contractual basis for RCT's purported termination; (2) RCT's verified original complaint contained binding judicial admissions that the Agreement was not terminated before its automatic expiration on September 14, 2016; and (3) RCT failed to provide notice of default as required by Paragraph 10.2 of the Agreement."  (Doc. 236 at 25.)  As to its first argument, Lilly asserts there was no contractual basis for termination because "RCT cannot demonstrate breach of contract under Counts I–III."  (*Id.* at 26.)  This argument is unavailing, given the Court's finding that Lilly breached the Agreement with respect to Counts II and III.  As to its second argument, the Court again notes an amended complaint supersedes prior ones.  *Supra* § III(A), n.10.  The current Complaint was filed in October 2018—long after RCT terminated the Agreement and the Agreement's natural expiration date.  (Doc. 149.)  *See infra* § III(F)(1).  Therefore, any supposed admission in the original complaint is irrelevant.

Lilly also argues Count IV fails as a matter of law because RCT did not adequately notify Lilly of default through the Kirkpatrick Letter.  (Doc. 236 at 29.)  In response, RCT contends the Kirkpatrick Letter was sufficient because ¶ 10.2 only requires written notice of default—it does not require such notice to state a party's intent to terminate the Agreement.  (Doc. 267 at 26.)  RCT further argues Lilly "effectively admitted its default" in November 2015 when it stated it "owed" overdue royalties under the Agreement and proposed to make a payment.  (*Id.* at 27.)  RCT also asserts the Kirkpatrick Letter was sufficient notice of default because attached to it was RCT's original complaint, which alleged several breaches of the Agreement and was filed in this Court one week after it was sent with the Kirkpatrick Letter to Lilly.  (*Id.* (citing Doc. 6 and PCSOF Exh. 158).)  Therefore, according to RCT, its option to terminate the Agreement arose thirty days after April 4, 2016 if Lilly failed to cure its default, even though RCT afforded Lilly more than thirty days to allow for mediation.  (*Id.* at 28.)  RCT argues no reasonable juror could find

the Kirkpatrick Letter failed to put Lilly on notice of its default.  (*Id.* at 28.)

The plain language of ¶ 10.2 requires the non-defaulting party only to "giv[e] . . . written notice of such default."  It does not require such party to express its intent to terminate the Agreement if the defaulting party fails to correct the default within thirty days of receiving notice.  Rather, ¶ 10.2 makes clear the non-defaulting party has the *option* to terminate the Agreement.  Nonetheless, Lilly argues Indiana law requires a notice of default to include both a declaration of the default and an express intention to terminate the contract.  (Doc. 236 at 28.)  The Court disagrees.

First, Lilly primarily relies on *Whiteco Indus., Inc. v. Nickolick* for the proposition that written notice of default "at a minimum" "was required to declare a default and express an intention to terminate the [contract]."  571 N.E.2d 1337, 1340 (Ind. Ct. App. 1991).  In *Whiteco*, the Indiana Court of Appeals concluded a letter sent by a landlord to his tenant in which the landlord "discussed the fact that the rent was overdue and that he had made several attempts to contact [Tenant] representatives regarding the matter" was insufficient to provide notice of default under the terms of the lease.  *Id.* at 1339.  Specifically, the landlord wrote:  "Since I have not heard from either you or [your representative], I feel it important to let you know that the rent has not been paid and ask that you do whatever is necessary to cause payment to be made as promptly as possible."  *Id.*  The lease provided the tenant a special option to purchase the property "upon a default by Tenant and upon the requisite notice having been given to Tenant," and specified the nonpayment of rent constitutes default.  *Id.* at 1340.  The lease also gave the landlord the right to terminate if the tenant defaults and specified the landlord's failure to exercise this right within 90 days of the default would waive the default and, in turn, the landlord's right to terminate.  *Id.*  After noting these provisions, the Court of Appeals explained:  "From these provisions it follows that the requisite notice must declare [Tenant]'s nonpayment of rent to be a default and that the [Landlord] intend[s] to exercise [his] right of termination unless [Tenant] pays the rent owed."  *Id.*  *Whiteco* is factually distinguishable from the instant case because the contract in that case specified failure to exercise the option to terminate within 90 days of the default would constitute a waiver of default and waiver of the right to terminate.  That

contract also provided the tenant—the defaulting party—the right to purchase the property upon the tenant's own default.  Unlike in *Whiteco*, the default under the Agreement here cannot be waived, and neither can a non-defaulting party's right to terminate the Agreement in the event of default.  More importantly, however, unlike the landlord's letter in *Whiteco*, the Kirkpatrick Letter did not merely request Lilly to pay what it owed—it expressly stated RCT would consider litigation if necessary and included a copy of the original complaint, which clearly stated the grounds for default.

Second, Lilly cites *City of Jeffersonville v. Env'tl Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011), to suggest Indiana law requires a notice of default to contain language "indicating that [plaintiff] intended to give [defendant] notice that it would terminate the Contract in 90 days absent a cure of [defendant's] deficient performance." (Doc. 236 at 28.)   In that case, the Indiana Court of Appeals concluded the City of Jeffersonville (the "City") had not provided written notice of Environmental Management Corp. ("EMC")'s unsatisfactory performance before terminating the contract. *Jeffersonville*, 954 N.E.2d at 1009.  There, the contract between the City and EMC gave both parties the right to terminate the contract early in the event of a material breach or unsatisfactory performance of a material obligation.  *Id.* at 1004.  However, the contract required the terminating party to first provide written notice of the material breach or unsatisfactory performance and provided the breaching party 90 days to cure the breach. *Id.*  If the breaching party failed to cure the breach, the non-breaching party could then terminate the contract.  *Id.*  At a meeting of the Sewer Board, City officials discussed concerns about EMC's performance and verbally instructed the Board's attorney to send a letter informing EMC of its deficient performance, and to send a letter terminating the contract 90 days later if, after the first letter, EMC did not correct the issues.  *Id.* at 1005. Accordingly, the City sent EMC a letter in which it referenced prior meetings during which the City "advised EMC of several deficiencies" in EMC's performance and wrote:  "To properly ascertain EMC's compliance with its contractual duties pursuant to Section 5(g) of said Agreement, please comply with the following requests."  *Id.* at 1008.  The letter then went on to request various records but did not in any way indicate the City intended

to terminate the contract in 90 days if EMC failed to cure its deficient performance.  *Id.*  The Court of Appeals held the Board meeting discussion did not constitute a notice of breach because it was not a written notice.  *Id.*  The Court of Appeals also found the letter's stated intent to "ascertain EMC's compliance" and requests for documentation did not constitute adequate notice of EMC's breach.  *Id.* at 1009.  This Court, however, finds the instant case distinguishable for two reasons:  (1) the Kirkpatrick Letter did not merely request documentation to ascertain Lilly's compliance—it plainly stated Lilly had failed to report its use of *Pichia* technology and owed RCT royalties and the attached complaint clearly alleged these were breaches; and (2) RCT specifically stated that if the parties could not resolve the breaches via negotiations or mediation, it would pursue litigation.

Notably, the Kirkpatrick Letter was not the first time Lilly's breaches were brought to light, as Lilly acknowledged it owed royalties to RCT in the November 25, 2015 letter it sent to RCT.  Although the November 25 letter indicates Lilly believed it was only obligated to pay royalties on the sale of CpB, it nonetheless demonstrates Lilly was aware it had failed to fulfill an obligation under the Agreement.  The Kirkpatrick Letter, sent almost five months later, clearly communicated RCT's position that Lilly owed royalties and had failed to timely report its use of *Pichia* technology.  Although the Kirkpatrick Letter does not contain the words "breach," "default," or "terminate," it clearly states RCT's intent to pursue litigation if the issue could not be resolved through negotiations or mediation.  As noted above, RCT attached to the Kirkpatrick Letter a copy of its original complaint which clearly asserts a variety of contractual breaches.

Based on the foregoing undisputed facts and context of the letters, and the Court's experience and common sense, the Court finds, as a matter of law, the Kirkpatrick Letter coupled with the attached original complaint was sufficient to put Lilly on notice of its default and RCT's intent to terminate if Lilly did not cure its breaches or a resolution could not be reached.  Therefore, Lilly is not entitled to judgment as a matter of law on Count IV.  Further, Lilly does not dispute RCT's assertion that it failed to "immediately return all Host Strains, Expression Vectors and Expression Systems in Licensee's or Affiliate's or sublicensee's possession" after termination, as required by ¶ 10.3.  Accordingly, the Court

finds summary judgment is appropriate on this count in favor of RCT and finds the Agreement was terminated on June 29, 2016.  *See* Rule 56(e) (summary judgment appropriate when "party fails to properly address another party's assertion of fact" after having opportunity to do so and undisputed facts show party is entitled to judgment).

### E. Count VI – Unjust Enrichment

In its Complaint, RCT alleges unjust enrichment as an alternative to its contract claims for Lilly's unauthorized use of the *Pichia* Technology.  (Doc. 149 at 19.)  Lilly moves for summary judgment on RCT's unjust enrichment claim, arguing this alternative common-law claim cannot be maintained because a valid contract exists and governs the parties' conduct.  (Doc. 236 at 29–31.)  In response, RCT explains the claim is "premised on a possible finding by this Court or the jury that the Agreement does not apply to Lilly's conduct because either:   (i) the Agreement does not govern Lilly's use of RCT's technology; or (ii) Lilly has impermissibly continued to use RCT's biological materials after termination of the Agreement."   (Doc. 267 at 29–30.)   Lilly contends RCT's allegations about Lilly's post-termination conduct "are not based on conduct separate from the Agreement—to the contrary, these are the same allegations that support the breach of contract claim in Count IV."  (Doc. 298 at 19.)

Under Indiana law, "[u]njust enrichment is an equitable remedy that permits a recovery, even in the absence of a contract, where justice demands it.  But where an express contract governs the parties' behavior, a claim for unjust enrichment is not cognizable." *CoMentis, Inc. v. Purdue Research Found.*, 765 F. Supp. 2d 1092, 1103 (N.D. Ind. 2011). "The existence of an express contract precludes a claim for unjust enrichment because: (1) a contract provides a remedy at law; and (2) as a remnant of chancery procedure, a plaintiff may not pursue an equitable remedy when there is a remedy at law."  *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011).  However, the Indiana Court of Appeals has recognized an exception when the conduct at issue is "not fully addressed by the [contract]."  *Id.* at 999; *see also CoMentis*, 765 F. Supp. 2d at 1103 ("A party cannot pursue equitable relief simply because its contract claim fails, without alternatively alleging that there was either no contract on point or the contract at issue was unenforceable.").

Because the Court finds the Agreement governs Lilly's use of RCT's technology in the production of Lilly's Diabetes Drugs, the Agreement provides a remedy at law; therefore, RCT's claim for unjust enrichment cannot survive for the time period during which the Agreement was in effect.  However, as RCT correctly asserts, the Agreement does not govern any actions or conduct after it was terminated on June 29, 2016.  (Doc. 267 at 32.)  Therefore, RCT's unjust enrichment claim may proceed for the period between June 30, 2016 (when RCT terminated the Agreement) and September 14, 2016 (when the last patent rights expired).[14]  *See Coppolillo*, 947 N.E.2d at 999; *see also CoMentis*, 765 F. Supp. 2d at 1103.

## F.    Count V – Conversion

Count V of RCT's Complaint alleges that, since at least 2003, Lilly knowingly or intentionally exercised unauthorized control over the biological materials licensed to Lilly. (Doc. 149 at 18–19.)  Lilly moves for summary judgment on RCT's conversion claim, arguing it cannot be sustained because:  "(1) the Agreement governs this dispute and (2) RCT cannot as a matter of law establish the element of 'deprivation' for conversion" because RCT maintained copies of the biological materials.  (Doc. 236 at 31.)  RCT argues its conversion claim must survive because it involves Lilly's conduct that is not addressed by the Agreement.  (Doc. 274 at 32.)  As to Lilly's deprivation argument, RCT asserts its right to possess the biological materials includes the "right to determine the recipients of those biological materials and to control the nature and scope of their use [to] ensure that RCT receives royalties for their use and preserve the viability and value of RCT's *Pichia* licensing program."  (Doc. 267 at 32–34.)

As to Lilly's first argument, as with RCT's unjust enrichment claim, the Court agrees the Agreement governs the dispute, but only for conduct that occurred before the Agreement was terminated on June 29, 2016.  Because the Agreement does not address Lilly's conduct *after* the Agreement was terminated, RCT's claim for conversion may

---

[14]Lilly and RCT agree the Agreement would have naturally terminated upon the expiration of the last patent rights, which they agree expired on September 14, 2016.  (Doc. 248 at 23; Doc. 264 at 2.)

proceed for the period between June 30, 2016 and September 14, 2016.  *See Coppolillo*, 947 N.E.2d at 998; *see also CoMentis*, 765 F. Supp. 2d at 1103.

Next, Lilly argues "RCT cannot as a matter of law show the essential element of 'deprivation,' because RCT admits that it possessed numerous copies" of the *Pichia* Host Strains and Expression Vectors.  (Doc. 236 at 33.)  Under Indiana law, "conversion is appropriating another's personal property for the tortfeasor's own use and benefit, in exclusion and defiance of the owner's rights, and under an inconsistent claim of title." *Harkins v. Westmeyer*, 116 N.E.3d 461, 472 (Ind. Ct. App. 2018); *see also Computs. Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995) ("Conversion, as a tort, consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's.). "[T]o maintain an action for conversion, the plaintiff must establish the appropriation of personal property by another for that party's own use and benefit in exclusion and defiance of the owner's rights." *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 829 (Ind. Ct. App. 2003) (*quoting Shourek v. Stirling*, 621 N.E.2d 1107, 1109 (Ind. 1993)).  And, "the essential elements of the plaintiff's claim are an immediate, unqualified right to possession resting on a superior claim of title." *Id.*  Although some older Indiana cases have explained the essence of conversion is "deprivation," that term does not appear as an element in any recent controlling case.[15]  Rather, it appears the term "deprivation" has been subsumed by the more recent, controlling case law cited above. Therefore, this Court applies the elements of conversion as set forth in *Harkins*, *Computers Unlimited*, and *Barna*.

The undisputed facts show RCT had an immediate right to possession of the materials and Lilly did not immediately return the materials to RCT when it terminated the

---

[15]Lilly relies on an Indiana Court of Appeals case from 1919 and 1974, as well as an Arizona Court of Appeals case from 1972.  (Doc. 236 at 32–33; Doc. 298 at 20.)

Agreement.[16]  Thus, the Court focuses on whether Lilly's failure to return the materials constituted an appropriation of the materials for its benefit in exclusion and defiance of RCT's right.  *See Barna*, 791 N.E.2d at 829.  Although Lilly had a lawful right to possess the biological materials for the duration of the Agreement, its right to possess and exercise dominion over them terminated on June 29, 2016 when RCT terminated the Agreement. Therefore, the question is whether the undisputed material facts show RCT cannot establish Lilly appropriated the materials for its own use and benefit, exercised dominion over the materials in exclusion and defiance of RCT's rights, or withheld the materials from RCT's possession after June 29, 2016.  *See id; Computs. Unlimited.*, 657 N.E.2d at 171.  As explained above, Lilly does not dispute it did not return or destroy the materials when the Agreement was terminated on June 29, 2016.  Rather, Lilly asserts RCT cannot establish the elements of conversion because RCT possessed copies of the materials.  (Doc. 236 at 33.)  Although it appears several federal district courts have determined conversion claims fail when the plaintiff retains copies of the allegedly converted material,[17] Lilly cites, and the Court is aware of, no controlling Indiana authority supporting such a contention. Accordingly, Lilly has not demonstrated it is entitled to judgment on RCT's conversion claim.  The Court notes, however, RCT has not disputed it retained copies of the materials. Therefore, although Lilly has not shown it is entitled to summary judgment on RCT's conversion claim, the Court is skeptical about whether RCT can establish any harm resulting from Lilly not destroying or returning the materials.  Based  on  the  undisputed facts and pertinent authority, the Court concludes Lilly has demonstrated it is entitled to judgment on Count V with respect to the period during which the Agreement was in effect, but has not shown it is entitled to judgment for the period during which the Agreement was not in effect.  *See* Fed. R. Civ. P. 56(g).  Therefore, Count V may proceed for the period

---

[16]Although RCT admits its practice is to "require[] all *Pichia* Expression Technology licensees whose licenses terminate, and parties who are found to be in unauthorized possession of RCT's *Pichia* Expression Technology, to destroy the *Pichia* materials in their possession," (PCSOF ¶ 123), the Agreement's requirement that Lilly "immediately return" the materials to RCT if the Agreement is terminated early, as it was here, evinces an immediate right to possess the materials.  *See* Agreement ¶ 10.3.

[17]Lilly cites several federal cases from California, Colorado, Illinois, and Missouri. (Doc. 236 at 33.)

between June 30, 2016 and September 14, 2016.  The Court, however, is uncertain what damages RCT could have suffered from Lilly's continued possession of the materials apart from the damages addressed by RCT's unjust enrichment claim.

### F.   RCT's Factual Requests in its Motion for Partial Summary Judgment

#### 1.   Natural Termination Date of Agreement (PSJ No. 6)

RCT moves this Court to find the Agreement would have naturally terminated on September 14, 2016 had RCT not terminated it before then.  (Doc. 248 at 23.)  RCT asks the Court to make this factual finding because it is relevant to whether Lilly, after receiving the termination notice, breached ¶ 10.3 by failing to immediately cease using and return to RCT all materials and information in Lilly and Sandoz's possession, as well as to RCT's conversion claim in Count V.  (*Id.*)  Lilly argues this issue is "moot" because RCT did not provide sufficient notice of default to Lilly, but "agrees that the Agreement automatically expired on September 14, 2016." (Doc. 264 at 2.)  Accordingly, the Court finds the natural termination date of the Agreement was September 14, 2016 and grants this portion of RCT's motion.

#### 2.   Lilly's Defenses

RCT asks the Court to "summarily dismiss" the following defenses:

##### i.   *Mutual Mistake (PSJ No. 7)*

In its Answer (Doc. 151), Lilly asserted:

> To the extent that the Phillips Agreement is construed to read literally that a "Reagent" must be used in the process of manufacturing or developing a product produced by an "Expression System," then the parties were mistaken at or around the time the Phillips Agreement was entered, and that mistake persisted until approximately October 2015.

In the parties' Rule 26(f) Joint Case Management Plan, Lilly again asserted the Agreement "does not reflect a meeting of the minds and is not what the parties intended" and, to the extent the Agreement "is construed, as RCT contends, that a 'Reagent' must be used in the process of manufacturing or developing a product 'produced by an Expression System,' then Lilly and Phillips were mistaken at or around the time the Phillips Agreement was

entered into, and that mistake persisted until approximately October 2015." (Doc. 178 at 30.)  This mutual mistake defense relates only to Count I.  (Doc. 264 at 15.)  Given the Court's resolution of Count I in favor of Lilly, this portion of RCT's motion is denied as moot.

ii.     *Royalties Cannot be Based on Sandoz's Proceeds (PSJ No. 8)*

RCT asks the Court to find on summary judgment "that the royalty owed under the Agreement cannot be based on the price Lilly paid Sandoz for CpB." (Doc. 248 at 28.) RCT relies on the November 25, 2015 letter in which Lilly "concluded royalties were owed" and asserted CpB should be treated as a Reagent and calculated royalties based on the amount Lilly paid Sandoz for CpB.  (PSOF Exh. 100; DSOF Exh. 9.)  RCT argues this theory "ignores the clear language of the Agreement" because ¶ 4.2.1 requires Lilly to pay RCT "a royalty of two percent (2%) of the Net Sales Value for End Product or Reagent sold by [Lilly], Affiliate or sublicensee during the term of this Agreement," and "Net Sales Value" is defined in ¶ 1.11 as:  "the proceeds actually derived from the sale of End Product, Reagent, or Bulk Product by [Lilly] or an Affiliate of [Lilly] to any third parties in the [world] less eight percent (8%) of said proceeds." (Doc. 248 at 26–28.)  That is, according to RCT, the Agreement requires royalties to be based on the proceeds from Lilly's sale of End Product to third parties.    (*Id.*)    Lilly contends ¶ 4.2.1 "directly supports an interpretation that royalties could be based on sales of CpB by Lilly's sublicensee, Sandoz" because it specifically includes:  "sold by Licensee, Affiliate or sublicensee." (Doc. 264 at 31–32.)

Given the Court's finding that Lilly's Diabetes Drugs are End Product under the Agreement, any such defense or argument on Lilly's part would be moot, as it is undisputed only Lilly—not Sandoz—sold the Diabetes Drugs.  Accordingly, this portion of RCT's motion is denied as moot.

iii.    *Statute of Limitations (PSJ No. 9)*

Finally, RCT argues Lilly's statute of limitation defense raised in its Answer should be dismissed. (Doc. 248 at 28–29.)  The parties agree the statute of limitations is ten years under Indiana law. (Doc. 248 at 29; Doc. 264 at 23.)  The parties, however, disagree as to

when the ten-year period began to run.  RCT asserts the injury here was continuous because the issue is Lilly's repeated, continuous failure to report its sales and pay royalties.  (Doc. 248 at 29.)  Under the Agreement, each report and payment are due no later than 90 days after the end of the calendar quarter for which royalties are payable.  ¶¶ 1.13, 4.5, 5.1.  Because Lilly believes it first sold the Diabetes Drugs on or about September 22, 2005, RCT asserts the first breach occurred on December 31, 2005.  (Doc. 248 at 29; PSOF Exh. 56.)  RCT admits it brought this action ten years and four months after the first breach, but contends it was timely under Indiana's "discovery rule" because it is "uncontroverted that RCT had no actual knowledge of Lilly's breach" until 2015.  (Doc. 248 at 29.)  RCT further asserts it exercised ordinary diligence and, in doing so, it could not have been aware of Lilly's breach because Lilly repeatedly denied any royalty-bearing activity and Lilly itself admitted it was unaware it owed royalties for its use of the *Pichia* Technology until 2014.  (*Id.* at 30.)  RCT also argues Lilly is "equitably estopped from raising the statute of limitations defense because it concealed from RCT its conduct for at least a year."  (*Id.* at 31.)

Lilly argues RCT's action is untimely because RCT's admissions demonstrate: RCT "could have found" issued patents and public papers with the relevant details of Lilly's use of *Pichia* to express CpB, but RCT does not explain why it failed to discover such patents and public papers; Lilly told RCT it was using the *Pichia* Technology to produce CpB in 1992; and Lilly could not have concealed its use of *Pichia* to produce CpB because that information was included in the patents and publicly issued papers.  (Doc. 264 at 24–27.)  Therefore, according to Lilly, RCT is not entitled to summary judgment on this point because a reasonable jury could find RCT knew of or could have discovered Lilly's failure to report and pay royalties "more than ten years before RCT filed this lawsuit."  (*Id.*)  Lilly reasons this by pointing to business records from the early 1990s that show Lilly intended to use *Pichia* to produce CpB and a 1997 article from a French pharmaceutical publication which announced Lilly had started producing CpB in France.  (*Id.* at 25–26; Doc. 262-9, Exh. 73.)  That article, published in French, explained the Lilly manufacturing site in France would produce three enzymes—trypsin, CpB, and di-aminopeptidase—and

indicated the enzymes were used in "the biotechnical insulin production process" and were obtained from *E. coli*, *Pichia pastoris*, and a mold.  (Doc. 262-9, Exh. 73.)  Lilly further asserts RCT should have known because Lilly disclosed its use of *Pichia* to produce CpB commercially in patents and international applications in 1995, 1997, and 2001.  (Doc. 264 at 26–18.)  Lilly also argues the date of its first sale of the Diabetes Drugs is "irrelevant[] because December 31, 2005 is more than ten years before RCT filed this lawsuit" and "a reasonable jury could find RCT 'knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained' well before Lilly's first actual sale of Humalog on December 31, 2005."  (*Id.* at 28.)

As noted, the statute of limitations for this action is ten years.  *See* Ind. Code Ann. § 34-11-2-11.  Determining when a cause of action accrues is generally a question of law.  *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009).  "Under Indiana's discovery rule, a cause of action accrues, and the limitation period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury."  *Id.*  For a cause of action to accrue, "it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred."  *Id.*  "The discovery rule is not intended to toll the limitation period until optimal litigation conditions can be established."  *Rieth-Riley Const. Co., Inc. v. Gibson*, 923 N.E.2d 472, 476 (Ind. Ct. App. 2010).  Rather, as Indiana courts have previously stated: "the purpose of the discovery rule is to limit the injustice that would arise by requiring a plaintiff to bring his or her claim within the limitation period during which, even with due diligence, he or she could not be aware a cause of action exists."  *Id.*  Therefore, when a party conceals discovery of the alleged injury, the statute of limitations is tolled until discovery of the injury.  *See In re Julie R. Waterfield Irrevocable Tr. Agreement Dated October 21, 1997*, 960 N.E.2d 800, 807 (Ind. Ct. App. 2011*)*; *State v. Puckett*, 531 N.E.2d 518, 524 (Ind. Ct. App. 1988).  However, the failure of a plaintiff to exercise reasonable care and diligence to discover the alleged injury precludes the tolling of the statute.  *In re Waterfield*, 960 N.E.2d at 807.

First, the Court rejects Lilly's assertion that the date of Lilly's first sale of Humalog

is irrelevant and that RCT could have discovered an injury had been sustained "well before Lilly's first actual sale of Humalog." (Doc. 264 at 28.) The primary injury RCT claims in this action is Lilly's breach of its reporting obligations and its failure to "pay royalties when due." (Doc. 149 at 18.) As noted above, ¶ 4.5 of the Agreement provides: "Royalty payments shall be due within ninety (90) days after the expiration of each Calendar Quarter Year that begins or ends during the term of this Agreement for all operations during such Calendar Quarter Year for which royalties are payable." Therefore, the first date when Lilly was required to pay royalties but failed to do so is the date on which the injury first occurred. The first injury here was Lilly's failure to report and pay royalties on its first sale of Humalog. Because that first sale was on or about September 22, 2005, the expiration of that quarter was September 30, 2005, and 90 days later was December 29, 2005. Therefore, the date of the first injury was December 30, 2005. Contrary to Lilly's argument, RCT could not have possibly known Lilly would fail to report and pay royalties before Lilly actually failed to report and pay royalties, and that failure could not have occurred before the first sale of Humalog. In other words, even if RCT had known or should have known Lilly was producing *Pichia*-made CpB as early as the 1990s, the mere use of *Pichia* to produce CpB and even the use of that CpB in insulin products was not a royalty-bearing activity and therefore could not have given rise to an injury until Lilly sold the Diabetes Drugs and failed to pay royalties on those sales. Thus, a reasonable jury could not find the statute of limitations was triggered before 2005.

As noted, RCT brought this action four months after the ten-year period, on April 4, 2016. And, because RCT alleges Lilly breached the Agreement each quarter since it began selling the Diabetes Drugs because the Agreement requires quarterly reporting and royalty payments, the injury first began December 30, 2005, but was repeated each calendar quarter thereafter. Therefore, the next two breaches would have occurred on March 31, 2006 and June 29, 2006. Accordingly, if the statute was not tolled, RCT's claims for the breaches in December 2005 and March 2006 would be barred, but the rest after April 4, 2006 would not be barred. In other words, if the discovery rule does not apply and does not toll the statute, then Lilly cannot be liable for royalties on any sales of its Diabetes

Drugs before April 1, 2006.  Therefore, the Court need only determine whether RCT exercised reasonable care and diligence to discover Lilly's breaches that occurred in December 2005 and March 2006.

RCT argues it exercised reasonable diligence because "[y]ear after year, Lilly represented to RCT that it made no royalty-bearing use of *Pichia*" in response to RCT's annual reminder to Lilly of its obligation to report and pay for royalty-bearing sales or pay the annual maintenance fee.  (Doc. 248 at 30.)  According to RCT, each year, Lilly responded by paying the minimum annual maintenance fee and did not report any royalty-bearing sales.  (*Id.*)  Lilly does not dispute this.  (Doc. 264 at 23–31.)  Rather, Lilly again relies on its argument that RCT should have known Lilly was using *Pichia* to produce CpB because of the patents, international applications, and the 1997 French article containing information about Lilly's CpB production process.  (*Id.*)  Again, this argument is unavailing.  Based on the record and briefing at this stage, however, the Court concludes there is a genuine dispute as to whether RCT exercised reasonable diligence in discovering Lilly's use of the *Pichia*-made CpB in the production of its Diabetes Drugs and the sale of those drugs that occurred between September 22, 2005 and March 31, 2006.  Accordingly, summary judgment is appropriate only to the extent the Court finds the undisputed material facts show RCT could not have possibly known of Lilly's breaches until it actually committed its first breach on December 30, 2005, and the breaches that occurred after April 4, 2006 are not barred by the statute of limitations.  Put simply, the only remaining question on this issue is whether RCT exercised reasonable diligence in discovering Lilly's breaches between December 30, 2005 and March 31, 2006.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds the undisputed facts establish the following:

(1)     Lilly's Diabetes Drugs are End Product under the Agreement and Lilly breached its reporting and royalty payment obligations by failing to pay the two-percent royalty owed for the Net Sales Value of the Diabetes Drugs, so RCT is entitled to judgment as a matter of law as to liability on Count III,

damages to be determined at trial;

(2)     Lilly did not exceed the scope of the license, so it is entitled to judgment as a matter of law on Count I;

(3)     Lilly did not breach the confidentiality provisions of the Agreement because Sandoz was in fact a sublicensee, but Lilly did breach ¶ 3.3 of the Agreement by failing to promptly notify RCT of the sublicense extended to Sandoz, so RCT is entitled to judgment as a matter of law as to liability only on Count II, with damages (i.e., causation and amount) to be determined at trial;

(4)     the Agreement was terminated on June 29, 2016, so Lilly is not entitled to judgment as matter of law on Count IV;

(5)     Lilly is entitled to judgment on Counts V (conversion) and VI (unjust enrichment) with respect to the period during which the Agreement was in effect, but is not entitled to judgment with respect to the period between when the Agreement was terminated on June 29, 2016 and when the Agreement would have naturally expired (i.e., when last of the patent rights expired) on September 14, 2016;

(6)     Counts V (conversion) and VI (unjust enrichment) may proceed for the period between when the Agreement was terminated on June 29, 2016 and when the Agreement would have naturally expired (i.e., when last of the patent rights expired) on September 14, 2016;

(7)     the Agreement's natural termination date was September 14, 2016, so RCT's "request" (No. 6) of its motion is granted;

(8)     Lilly's mutual mistake defense is moot, given the disposition of Count I, so RCT's "request" No. 7 is denied as moot;

(9)     Lilly's argument/defense that royalties should be based on Sandoz's sale of CpB to Lilly is moot, given the disposition of Count III and the Court's factual determination that the Diabetes Drugs are End Product, so No. 8 of RCT's motion is granted; and

1       (10)   RCT's "request" No. 9 of its motion is granted in-part to the extent Lilly's

2             statute of limitations defense is dismissed with respect to the breaches that

3             occurred on or after April 4, 2006, but RCT has not demonstrated it is entitled

4             to judgment on Lilly's statute of limitations defense with respect to the

5             breaches that occurred before April 4, 2006.

6     Accordingly,

7     **IT IS ORDERED** Lilly's Motion for Summary Judgment (Doc. 236) is

8 **GRANTED in-part** as to Counts I, V, and VI, and is **DENIED** in-part as to Counts II, III,

9 IV, V, and VI.

10     **IT IS FURTHER ORDERED** RCT's Motion for Partial Summary Judgment

11 (Docs. 238, 248) is **GRANTED in-part** on Counts II and III, with damages to be proven

12 at trial. RCT's Motion (Docs. 238, 248) is also **GRANTED in-part** with respect to factual

13 finding requests No. 6 (Natural Termination of Agreement), No. 8 (Royalties Cannot be

14 Based on Sandoz's Proceeds), and No. 9 (Statute of Limitations), and is **DENIED in-part**

15 as to No. 7 (Mutual Mistake Defense) and No. 9 (Statute of Limitations) only to the extent

16 that RCT has not demonstrated it is entitled to have Lilly's statute of limitations dismissed

17 for the breaches that occurred before April 4, 2006.

18     **IT IS FURTHER ORDERED** RCT is entitled to summary judgment on Count IV

19 pursuant to Rule 56(f), with damages to be determined at trial.

20     **IT IS FURTHER ORDERED** Counts V and VI may proceed for the period

21 between when the Agreement was terminated on June 29, 2016 and when the last of the

22 patent rights expired on September 14, 2016.

23     . . . .

24     . . . .

25     . . . .

26     . . . .

27     . . . .

28     . . . .

**IT IS FURTHER ORDERED** the parties shall disclose trial witnesses pursuant to Rule 26(a)(3) **within 14 days of this Order** and the parties shall file a Joint Proposed Pretrial Order **within 30 days of this Order**.  *See* Doc. 68 (May 19, 2017 Scheduling Order).

Dated this 19th day of October, 2021.

Honorable Scott H. Rash
United States District Judge